In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1339

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JOSEPH E. KLUG,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 10-CR-30033-MJR—**Michael J. Reagan**, *Judge.*

ARGUED OCTOBER 4, 2011—DECIDED FEBRUARY 29, 2012

Before CUDAHY, FLAUM, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Joseph E. Klug pleaded guilty to producing and possessing child pornography. *See* 18 U.S.C. §§ 2251(a), 2252(a)(4)(B). After calculating an imprisonment range of life, the district court sentenced Klug to a total of 384 months. On appeal, Klug argues that his prison sentence is unreasonably long. We affirm the judgment.

Klug came to the attention of law enforcement after an FBI agent, using a peer-to-peer network, discovered

that an Internet address assigned to Klug was being used to share child pornography. After agents learned that Klug held a leadership position in the Royal Rangers, a children's youth ministry, they executed a search warrant at his residence. Agents interviewed Klug, and he confessed to having a large collection of child pornography. He also admitted to surreptitiously filming boys he supervised on Royal Rangers camping trips or encountered in the locker room of his health club. During camping trips Klug had hidden a camera in his backpack to film boys showering. On one occasion, he used a hidden camera to film a boy changing clothes while in a tent; this filming also happened to record the boy masturbating. And after one camping trip he brought a boy back to his house and then secretly filmed him using the restroom. Klug cropped the facial features of his subjects, who ranged from 9 to 14, before trading those pornographic images for more child pornography. He denied molesting any children, and the boys he secretly filmed on the Royal Rangers trips, who were interviewed during the investigation, did not indicate that they perceived Klug to have touched them in inappropriate ways. Klug conceded in his FBI interview, however, that he had fantasized about the children, wishing to perform oral sex on them, and that he went out of his way to be physically close with them, brushing up against them, squeezing shoulders and patting backs.

When examining Klug's computers and related equipment, agents uncovered 59,000 still images of child pornography and 12,000 videos of child pornography (the

latter being equivalent for guidelines purposes to 900,000 still images, *see* U.S.S.G. § 2G2.2 cmt. n.4(B)(ii)). Those images include depictions of sexual abuse, bestiality, and infants. Authorities also uncovered chat logs of graphic exchanges between Klug and other persons interested in child pornography. The chats revealed Klug's fantasies about molesting children, as well as solicitations for videos from private collections and advice from Klug on how to sexually violate children.

The district court calculated an imprisonment range of life based on Klug's total offense level of 43 and criminal history category of I. Before the court imposed sentence, the government presented testimony from the FBI agent who investigated and interviewed Klug. The government also submitted statements from children depicted in Klug's collection of child pornography. The parents of one of the boys filmed by Klug submitted separate written statements describing how Klug's actions left them unwilling to entrust their son with male chaperones. The boy's mother explained that her son does not know he was taped but she experiences significant anxiety from knowing that one day he will find out. Klug testified, too, and called his parents and his wife, as well as several friends, as character witnesses. Klug apologized to the court, his victims, and his family for his "selfish" and destructive behavior, and he told the court that he was seeking counseling for his addiction to child pornography.

In explaining the prison sentence, the district judge began by noting that he credited all of the testimony,

including Klug's character witnesses. The judge balanced Klug's spotless criminal history against his total offense level, the highest listed in the guidelines. The judge first addressed Klug's conviction for producing child pornography, highlighting that Klug had abused his position of trust by filming boys he supervised and then distributing their images on the Internet. The judge pointed to a victim impact statement he had seen repeatedly in child-pornography cases and deemed particularly compelling: The victim depicted in the "Vicki series," which Klug possessed, explains in her victim impact statement that her "whole world came crashing down" when she discovered that the videos that her father made while raping her were circulating on the Internet. Echoing the concerns of the mother of one of the boys Klug had filmed, the judge explained that, although the boys were not yet aware that images of them were circulating, he found it troubling that "[t]here will come a time when they recognize that out of their control is an image of their body, whether their face is visible or not, that is being bought and sold and traded like a chattel." The judge then moved on to Klug's conviction for possession, pointing out that his collection of child pornography was the largest the judge ever had encountered. The judge expressed concern that Klug's massive collection had not satiated his addiction and instead, he continued to try to increase the collection, which prompted the judge to question whether physical abuse would have been Klug's next step.

The judge highlighted Klug's chat logs, which he found particularly troubling. Klug had created an online

fantasy life in which he has at least one son, and in one of those chats introduced at sentencing, he recounts performing oral sex on the boy "so that he could learn what it was like" and, in another incident, sexually molesting the boy and the boy's friend during a trip to Toronto. The chats also include Klug coaching a chat partner about grooming children for sex, achieving penetration, and concealing the abuse. Klug instructed that chat partner to warn young victims not to tell anyone what had happened because disclosure would embarrass them. In addition, Klug asked a trading partner to create child pornography for him.

The district court could have sentenced Klug to a total of 40 years (30 years for production and a consecutive 10 years for possession). *See* 18 U.S.C. §§ 2251(e), 2252(b)(2). But the statutory maximum, the judge reasoned, was greater than necessary given Klug's employment history and supportive spouse, and the absence of any history of sexual abuse or drug abuse. The judge settled on a total of 384 months.

On appeal Klug contends that 384 months in prison is too harsh. An overall sentence of that magnitude, Klug reasons, should be reserved for producers of "hard-core pornography that depicts children being raped by adults or engaged in explicit sexual activity with other children." His videos, Klug maintains, are "categorically different" because they only depict "children dressing and undressing" and, "in one incident not alleged to have been planned, masturbating." Klug does not argue that the sentencing court committed any procedural error.

Because Klug's overall prison sentence is below the guidelines range, we apply a presumption of reasonableness. *See Rita v. United States*, 551 U.S. 338, 347-56 (2007); *United States v. Tanner*, 628 F.3d 890, 908 (7th Cir. 2010) (noting that guidelines range of life imprisonment effectively renders "any prison sentence presumptively reasonable on appeal"); *United States v. Noel*, 581 F.3d 490, 500 (7th Cir. 2009) (concluding that 80-year sentence for producing and possessing child pornography was presumptively reasonable given guidelines range of life in prison). Klug does not suggest that the district court failed to consider the information pertinent to the factors in 18 U.S.C. § 3553(a), nor does he point to any factors that would overcome the presumption we apply.

Instead, Klug's stance seems to be that no harm came to the children he filmed because there was no sexual contact, and thus, he reasons, his prison sentence is excessive. But Klug's definition of harm is far too narrow. As the district court observed, Klug circulated his films on the Internet and caused distinct and serious harm to his victims by giving their images a permanent existence and the potential for endless replication, all of which is beyond the control of the victims. And even though the facial features in the images were cropped before they were traded by Klug, facial features are not the only basis that can be used to identify or recognize a person depicted in an image. The Supreme Court, concluding that governments have the greatest latitude to regulate sexually explicit images when children are depicted, observed that child pornography is pernicious precisely because the harm it produces is not limited to

the sexual abuse it depicts. "Because the child's actions are reduced to a recording," the Court reasoned, "the pornography may haunt him in future years, long after the original misdeed took place." *New York v. Ferber*, 458 U.S. 747, 760 n.10 (1982); *see also Osborne v. Ohio*, 495 U.S. 103, 111 (1990) (observing that "pornography's continued existence causes the child victims continuing harm by haunting the children in years to come"). The Court emphasized this point in *Ashcroft v. Free Speech Coalition*, observing that "as a permanent record of a child's abuse, the continued circulation itself would harm the child who had participated." 535 U.S. 234, 250 (2002). As with defamatory statements, the Court explained, every publication of the image "would cause new injury to the child's reputation and emotional well-being." *Id.* Indeed, in the years since *Ferber* was decided, federal courts have focused on the enduring harm to the child victims in concluding that child pornography offenses warrant harsh sentences. *See United States v. Blinkinsop,* 606 F.3d 1110, 1118 (9th Cir. 2010) (observing that laws punishing receipt and possession of child pornography create incentive to destroy materials and thus alleviate the continuing harm inflicted on child victims whose "images have been preserved in a permanent medium")*; United States v. Daniels,* 541 F.3d 915, 924 (9th Cir. 2008); *United States v. Goff,* 501 F.3d 250, 259 (3d Cir. 2007); *United States v. Gross,* 437 F.3d 691, 693 (7th Cir. 2006); *see also* Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26 (1996) (setting out Congressional finding that "the creation or distribution of child pornography which includes an

image of a recognizable minor invades the child's privacy and reputational interests, since images that are created showing a child's face or other identifiable feature on a body engaging in sexually explicit conduct can haunt the minor for years to come").

Moreover, this court has upheld lengthy sentences for defendants involved in producing child pornography, even where the victims were not molested in the process. In *Noel* an 80-year sentence was affirmed under nearly identical circumstances. 581 F.3d at 500. The defendant in *Noel* babysat the young son of his stepbrother but abused his position of trust by taking nude photos of the child while he slept. *Id.* at 493. He was convicted of multiple counts of producing child pornography based on those photographs and was also convicted of possessing those images and other images of child pornography from different sources. *Id*. A total offense level of 48 and criminal history category of I yielded a guidelines range of life in prison, *id.* at 495, and Noel argued that 80 years was unreasonable. *Id*. at 500. Despite the absence of sexual abuse, the presumption of reasonableness allowed this court to "quickly dismiss Noel's argument" that his sentence was too long. *Id*.

Similarly, in *United States v. Newsom*, we upheld a total sentence of 324 months' imprisonment for a defendant convicted of crimes related to child pornography, including a count of production based on surreptitious films of his own daughter and a former girlfriend's daughter. 428 F.3d 685, 689-90 (7th Cir. 2005). The period of imprisonment was within the guidelines range and

included the statutory maximum for the production count (240 months at that time). *Id.* at 686. The defendant argued that the amount of prison time was excessive because, in his view, the term "was far longer than sentences imposed on other defendants whose crimes were worse than his own." 428 F.3d at 689. We began by emphasizing that "§ 3553(a) does not ban all disparities; its concern is only with unwarranted disparities." *Id*. We then concluded that the defendant's comparisons to "other defendants whose crimes were worse than his own" were not enough to overcome the presumption of reasonableness. *Id.*

Although Klug does not use the term "marginal deterrence," *see United States v. Beier*, 490 F.3d 572, 575 (7th Cir. 2007), he essentially contends that others will not be deterred from producing "hard-core" child pornography because his own sentence would not have been higher even if he had produced child pornography by sexually abusing the boys in his care. But we have explicitly rejected the utility of marginal deterrence in cases involving the production of child pornography. *See United States v. Maulding,* 627 F.3d 285, 288 (7th Cir. 2010); *Beier*, 490 F.3d at 575; *Newsom*, 428 F.3d at 689-90. We explained in *Beier* that marginal deterrence does not mandate that "crimes of different gravity must *never* be punished the same. It is that punishing two crimes of different gravity the same is unsound when to do so would encourage additional crimes." *Beier*, 490 F.3d at 575. The theory of marginal deterrence does not aid defendants like Klug who produce child pornography because "child pornographers who molest the children

whom they photograph can be punished separately for molestation." *Id*. Thus, even though the young victims in this case were not physically molested in the process of the production of the child pornography, we do not conclude that the sentence imposed was unreasonable in light of all of the evidence presented to and properly considered by the district court.

Because Klug's reasonableness challenge is without merit, we AFFIRM the judgment.

CUDAHY, concurring. I join the majority opinion because I agree that the sentence is within the guidelines and therefore presumptively reasonable and, particularly in the case of this multifaceted crime, much is left to the discretion of the sentencing judge after consulting 18 U.S.C. § 3553. Admittedly, however, this leaves many questions unanswered and many possible questions unasked. These questions relate, among other things, to what are the primary evils sought to be reached by the prosecution of various strands of child pornography, what are the relationships, if any, between many different sorts of violations and what are the prospects for repeat offenses by those who have been severely punished for these offenses. It may be a matter of consequence

that the district court itself at the time of sentencing announced that the crime in question was one it did not understand. I am sure it was not alone in this sentiment.

The most well-known and authoritatively established evil of child pornography production is the overt exploitation of children as performers in pornographic depictions. The role of performers as victims is illustrated by the distinction drawn by the Supreme Court between real human performers and virtual images. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 240, 249 (2002) (noting that children are "exploited by the production process" and that child pornography is "a permanent record of a child's abuse"). The present case presents the producer not as a coercive manipulator of children but as a sort of "peeping Tom" catching children at intimate moments and exposing them for the world to see. What difference, if any, do these circumstances make?

This brings us to a second violation, uncharged but evident here—distribution of pornographic images. Here, one of the key evils to be reached by prosecution is the exposure of pictured children to widespread humiliation. The district court in its sentencing discussion emphasized this aspect of things by citing the profound effect on it of the "Vicki video" victim impact statement by the subject of that video who was deeply distressed by the broad circulation of identifiable images of her being raped by her father. However, the present video differs in that the victims' identities have been excised. How does this weigh on the scales? Of course, a perhaps

more obvious factor in the analysis is the one argued most strenuously by the defendant: namely that the images portrayed on his videos of showering, disrobing and even masturbating are relatively mild stuff compared with forcible rape.

The other violation charged here involves possession of pornographic images in quantities apparently rarely equaled. As explicated in *Ashcroft*, the primary evil here is the creation of a market for the production of images involving the evils already briefly described. Since possession carries a maximum sentence of ten years, it does not figure as significantly in sentencing controversy. But it, as well as other child pornography offenses, leads to the issue that has involved almost unlimited speculation but few conclusions: does violation of the child pornography statutes predict actual physical child abuse, which most analysts regard as the most dangerous evil of this complex. In the present case, there was no evidence that the defendant had committed physical child abuse and, although the district court raised the issue whether the pornography offenses pointed in that direction, left the question as undemonstrated or at least unproven. The district court thus followed in the wake of numerous opinions in many circuits that have speculated, called for more research or merely assumed what seemed likely conclusions. Several courts of appeals have begun to more aggressively review these cases for substantive reasonableness. *See, e.g., United States v. Apodaca*, 641 F.3d 1077 (9th Cir. 2011); *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010); *see also United States v. Grober*, 624 F.3d 592, 603-10 (3d Cir. 2010).

These are only some of the issues presented here, and generally in these child pornography cases about which the guidelines and other sources of authority provide little guidance and about which there is almost inevitable speculation but facts or solid conclusions are hard to come by. Under these circumstances uniformity cannot be achieved and justice is elusive. All the responsible contributors to the sentencing process need to focus on a better provision of reasonable standards as to the issues I have mentioned and many others presented by these multifarious crimes.

2-29-12