In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1499

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTHONY BANAS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CR 976-2—**Ruben Castillo**, *Judge.*

ARGUED JANUARY 25, 2013—DECIDED MARCH 14, 2013

Before EASTERBROOK, *Chief Judge*, and BAUER and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Anthony Banas committed extraordinary crimes—he bilked investors out of more than $70,000,000 and lined his own pockets with the health care savings of people who trusted him. Anthony Banas also showed extraordinary contrition—he admitted his guilt, accepted responsibility for his actions, and he has worked hard to secure some degree of restitution

for his victims. Faced with the ancient tension between justice and mercy, the district judge sentenced Banas to 160 months of imprisonment. That was a significant sentence, but one well below the Guidelines range. Banas appealed, challenging his sentence on both procedural and substantive grounds. Because Banas's sentence was reasonable and free of procedural error, we affirm.

## I. BACKGROUND

The facts of this case, which we draw from the Presentence Investigation Report ("PSR"), Banas's plea agreement, and the plea agreement of his co-defendant, are largely undisputed. The story begins in 2003, when Congress created Health Savings Accounts. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. 108-173, § 1201, 117 Stat. 2066, 2469-79 (2003). These accounts help people with high-deductible health plans save for health care costs by providing tax-preferred treatment for money saved for future medical expenses. *See* 26 U.S.C. § 223. In 2004, defendant Anthony Banas, along with Jeremy Blackburn and Vikram Kashyap, started a company called Canopy Financial, Inc. The company created a suite of software products that allowed savers to manage their Health Savings Accounts online. Blackburn served as Canopy's president, Kashyap as its CEO, and Banas as its Chief Technology Officer.

Canopy's innovative software won praise throughout the industry. Business grew, and, by 2009, Canopy had over a hundred employees. Its success also attracted

the attention of venture capital and private equity firms. Before deciding to invest, these firms required Canopy to turn over various financial documents. Canopy provided them, including financial statements audited by KPMG, a respected international accounting firm. Satisfied that Canopy was a solid investment, a group called Spectrum Equity Investors bought $62,400,000 in preferred stock. Investors at other firms bought another $12,500,000 in preferred stock.

There was only one problem: Canopy had cooked the books. For starters, there never was a KPMG audit. Instead, Blackburn concocted financial statements out of thin air and put them on fake KPMG letterhead. These counterfeits suggested—falsely—that Canopy's revenue exceeded its expenses. Banas played a part, too; he reviewed the phony papers to make sure they looked like real KPMG documents. Banas also sent emails, drafted by Blackburn, that falsely suggested Canopy was in contact with KPMG auditors.

The two men took other steps to further their fraud. Banas recruited a Canopy employee to pose as a customer on calls with investors. Banas and Blackburn used this fake "customer" to funnel more false information to Spectrum. Blackburn also concocted fake bank statements in Canopy's name, and Banas knowingly forwarded these statements on to Spectrum.

Worse, Blackburn and Banas started raiding their clients' Health Savings Accounts. Given the nature of its business, Canopy had access to millions of dollars in client funds. Eventually, the allure of that cash proved too

great, and Banas and Blackburn started using it to pay Canopy's operating expenses and to feather their own nests. At the same time, they made fraudulent misrepresentations to induce their clients to keep the money coming. Banas, for instance, falsely represented to a corporate customer (who represented roughly 700 individual clients) that the clients' deposits were earning 4.25% interest. In fact, they were earning far less.

By the time Banas and Blackburn were stopped, they had misappropriated more than $18,000,000 in client funds. Blackburn spent roughly $6,000,000 in client funds on home renovations, fancy watches, a fleet of luxury cars, and a lease on a corporate jet. Banas stole less—somewhere in the area of $700,000—but he still lived the high life. He rented a mansion in California for $20,000 a month, drove a Lamborghini, and threw lavish parties. Of the $700,000 in client money that he stole, Banas invested about $300,000 in a nightclub and another $400,000 for his own "personal expenditures." (Plea Agreement at 8.) The people he stole from were less fortunate. Victims who lost their health savings included retirees, working families, and a breast cancer patient who "desperately needed" the lost money to pay for surgery and chemotherapy. (PSR at 6-8.)

In early 2009, Canopy's board of directors started to get suspicious and ordered an internal investigation. The FBI also got involved after an insurance provider noticed that Canopy's customers were bouncing checks for health care services. When the FBI confronted Banas on December 20, 2009, he gave a full confession. Once the fraud came to light, Canopy went bankrupt.

Following his confession, Banas consented to several civil judgments against him and cooperated with the FBI, IRS, SEC, and Canopy's bankruptcy trustee. He also scaled back his lifestyle and turned over almost all of his assets as restitution to his victims. On March 1, 2010, the government returned an information against Banas for two counts of wire fraud under 18 U.S.C. § 1343. Banas waived indictment, and on September 8, 2010, pled guilty to one count of wire fraud. Blackburn also pled guilty. On January 24, 2012, the district court sentenced Blackburn to 180 months of imprisonment. Blackburn will not serve that sentence; he was found dead the day before he was to report to prison.

Banas appeared before the same district judge for sentencing a few weeks later. The probation office calculated Banas's Guidelines sentencing range at 188-235 months, and the government asked for a 180-month sentence. Banas, on the other hand, argued that his sentence should be "significantly less than Mr. Blackburn's" 180-month sentence. (Sentencing Tr. at 24.) Ultimately, the district judge sentenced Banas to 160 months of imprisonment. Banas now appeals, arguing that this sentence was both procedurally improper and substantively unreasonable. For the reasons that follow, we disagree.

## II. ANALYSIS

*A. Procedural Error*

District judges, not appellate judges, are best positioned to determine criminal sentences. *See United States*

*v. Gammicchia*, 498 F.3d 467, 469 (7th Cir. 2007). As a result, we generally defer to a sentencing court's judgment and review the substance of criminal sentences only for abuse of discretion. *See United States v. Leiskunas*, 656 F.3d 732, 736-37 (7th Cir. 2011). But whenever "a district judge is required to make a discretionary ruling that is subject to appellate review, we have to satisfy ourselves, before we can conclude that the judge did not abuse his discretion, that he exercised his discretion, that is, that he considered the factors relevant to that exercise." *United States v. Robertson*, 662 F.3d 871, 880 (7th Cir. 2011). In other words, we will not defer to a sentencing court until we are satisfied, under *de novo* review, that the court followed proper sentencing procedure. *United States v. Jones*, 696 F.3d 695, 699 (7th Cir. 2012).

That procedure begins with calculating the advisory range under the Sentencing Guidelines. *Id*. at 700. Following that, "the defendant must be given the opportunity to bring to the court's attention any factors under [18 U.S.C.] § 3553(a) that might warrant a sentence below the Guidelines range." *Id.* The sentencing judge is then required to consider these statutory factors. *United States v. Williams*, 425 F.3d 478, 480 (7th Cir. 2005). That said, "the judge need not discuss and make findings as to each of these factors," *id*., and "we regularly affirm sentences where the district judge does not explicitly mention each mitigation argument raised by the defendant," *United States v. Paige*, 611 F.3d 397, 398 (7th Cir. 2010). Instead, it "is enough that the record confirms that the judge has given meaningful consideration to the section 3553(a) factors." *Williams*, 425 F.3d at 480.

Banas's opening brief contends that the district court made a procedural mistake by failing to consider two of his arguments in mitigation.[1] Banas acknowledges that the district court "referenced" his "main arguments" that (1) Blackburn manipulated him; and (2) Banas fully cooperated with the government. (Appellant's Br. at 12.) But, Banas continues, the district judge did not "provide any insight into how those items were considered in calculating Banas'[s] sentence." (*Id.*) Thus, Banas concludes, the district court "provided no reasoned basis for the chosen sentence." (*Id.*)

We disagree. The district judge specifically stated that he had weighed "all of the 3553 factors" both in mitigation and in aggravation. (Sentencing Tr. at 29.) Moreover, it is clear from the face of the record that the judge gave "meaningful consideration," *Williams*, 425 F.3d at 480, to both of Banas's key arguments. Regarding Banas's manipulation argument, the district judge had this to say:

> I could see how there was some manipulation by Mr. Blackburn of Mr. Banas and a long-term friendship. Mr. Blackburn is certainly a character in and of himself, as shown by not only the financial fraud and his ability to sell himself and his company but also in his personal lifestyle. Some would refer to Mr. Blackburn as a bad seed.

---

[1] Banas raises additional procedural arguments in his reply brief. Because Banas did not raise these arguments in his opening brief, they are forfeited, and we will not address them. *See United States v. Carter*, 695 F.3d 690, 701 n.6 (7th Cir. 2012).

But, Mr. Banas, when you run into a bad seed, you are ultimately left with a choice. You either help the bad seed succeed or you walk away from the whole thing. Or the best choice of all is to stop the bad seed. And there is no doubt, your attorney Mr. Roadman points out, that you could and should have stopped this fraud. And you did not. And I wish you had because that would make sentencing you so much easier.

(Sentencing Tr. at 28.)

And regarding Banas's cooperation, the district judge stated:

I certainly credit your cooperation. Your efforts with the Trustee [appointed to recover assets for the victims of the fraud] are very commendable. The letters that have been written on your behalf I think are somewhat different than the letters that have been—were written for Mr. Blackburn. I think there is much more character to you. And in particular I will tell you the letters written by your parents are heartbreaking. It is heartbreaking for a son to have to have letters like that from his parents.

But I will tell you, just as heartbreaking are the letters from victims in this case who are searching for those funds to take care of their medical needs.

(*Id*. at 28-29.)

There is little for us to add. The record clearly shows that the district judge meaningfully considered Banas's arguments. As a result, there was no procedural error. *See Williams*, 425 F.3d at 480.

## B. Substantive Error

Banas also argues that his sentence was substantively unreasonable because it (1) failed to account for various mitigating factors; and (2) is disproportionately long compared to Blackburn's sentence. Our review is deferential, and we will reverse only if the district court abused its discretion. *United States v. Matthews*, 701 F.3d 1199, 1203 (7th Cir. 2012). Where, as here, the sentence is below the Guidelines range, we presume that it is reasonable. *United States v. Klug*, 670 F.3d 797, 800 (7th Cir. 2012). Moreover, where, as here, the district court "has correctly calculated a Guidelines range, we assume that significant consideration has been given to avoiding unwarranted disparities between sentences." *United States v. Statham*, 581 F.3d 548, 556 (7th Cir. 2009). This assumption also applies "with added force" in this case because Banas does not challenge "the technical accuracy of the district court's Guidelines calculation" and "the district court imposed a sentence well below the suggested Guidelines range." *United States v. Dean*, ___ F.3d ___, No. 12-1539, 2013 WL 362781, at *3 (7th Cir. Jan. 31, 2013).

The district court sentenced Banas to 160 months of imprisonment. Banas acknowledges, as he must, that this sentence is below the Guidelines range of 188-235

months. He also acknowledges that this sentence was below the 180-month sentence given to Blackburn, his co-defendant. Nevertheless, Banas argues that his sentence was objectively unreasonable because it was not even lower.

We disagree. True, many facts weigh in favor of mitigation. Banas is a first-time offender and is unlikely to recidivate. To his great credit, he admitted his guilt, took responsibility for his actions, and has worked to provide restitution to his victims. Arguably, he was less involved in planning the fraud than Blackburn. And, even if Banas was greedy and unscrupulous when he looted Canopy, at least he did not manage to loot quite as much as Blackburn did.

But the district judge heard and considered all of these facts.[2] And set against them, the district judge also had to consider the extraordinarily serious nature of the underlying crime. Banas was a key player in more than

---

[2] Banas also argues that an earlier release would allow him to earn more money to pay as restitution to his victims. (Appellant's Br. at 19-20.) But Banas did not present this argument to the district court. (*See* R. 84); (Sentencing Tr. at 12-24). As a result, the argument is forfeited, and we review it only for plain error. *See United States v. Taylor*, 628 F.3d 420, 424 (7th Cir. 2010). We do not think that a plain error occurred here. A plain error is (1) an error (2) that is "clear" or "obvious" and (3) affected the defendant's "substantial rights." *United States v. Olano*, 507 U.S. 725, 734 (1993). We do not think it would have been a "clear" or "obvious" error to conclude that the value of the extra restitution Banas might earn was outweighed by the need to punish Banas for his crimes.

$90,000,000 of theft and fraud. That fact alone could reasonably justify a significant sentence. *See United States v. Vallone*, 698 F.3d 416, 497-98 (7th Cir. 2012) (in sentencing defendant for tax crimes, mail fraud, wire fraud, and conspiracy, the district judge could reasonably consider the $50,000,000 loss amount as a "significant factor" in favor of a longer sentence).

Even worse was Banas's choice of victims. Banas stole medical savings from his clients and used them to finance his own high-rolling lifestyle. Surely stealing health care money from sick people also justifies a lengthy sentence. *Cf. United States v. Schlueter*, 634 F.3d 965, 967 (7th Cir. 2011) ("an above-range sentence was appropriate because Schlueter . . . took advantage of personal relationships to cheat them out of significant sums they needed at critical stages of their lives"); *United States v. Tockes*, 530 F.3d 628, 634 (7th Cir. 2008) (approving above-range sentence for defrauding an elderly couple); *United States v. King*, 506 F.3d 532, 536-37 (7th Cir. 2007) (approving above-range sentence for defendant who "pocket[ed] funds set aside for victims of Hurricane Katrina"). And the district judge here reasonably recognized this fact; he stated that he had "never seen another financial crime this aggravated" in eighteen years as a federal judge. (Sentencing Tr. at 27.) Given the severity of the crime, and the fact that Banas still received a below-Guidelines sentence, we do not think that the district judge's sentence was unreasonably harsh.

Finally, Banas argues that he was entitled to "a far lesser sentence than Blackburn" because he was less

culpable than Blackburn. (Appellant's Br. at 17.) This argument borders on frivolous. Banas *received* a lower sentence than Blackburn; Banas got 160 months, and Blackburn 180 months. And, because that sentence was below-Guidelines, we presume it to be reasonable. *See Klug*, 670 F.3d at 800. Banas has not overcome that presumption. It was not unreasonable—or an abuse of discretion—for the district court to decline to give an even lower sentence for such a serious crime.

### III.  CONCLUSION

We AFFIRM Banas's sentence.