# United States Court of Appeals
## For the First Circuit

No. 02-1876

UNITED STATES,

Appellee,

v.

DUNN M. BECKETT, A/K/A DUNN GIRARD,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, Senior U.S. District Judge]

Before

Torruella, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

David A. Levy for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Gerard B. Sullivan, Assistant United States Attorney, and Margaret Curran, United States Attorney, were on brief, for appellee.

February 25, 2003

**STAHL**, **Senior Circuit Judge**. After a jury trial, defendant-appellant Dunn Beckett was convicted of one count of possessing a sawed-off shotgun in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871 (2002). Police officers discovered the shotgun in plain view at Beckett's residence while executing a state court warrant seeking evidence of Beckett's involvement in two murders. Beckett now appeals from the denial of his pretrial motion to suppress the weapon and the denial of his motion for acquittal.

## I. Background

### A. Procedural history

On August 15, 2001, a Rhode Island magistrate issued a warrant permitting law enforcement to search Beckett's residence in Cumberland, Rhode Island. The search warrant authorized officers to search for (1) the weapon used in the second murder, a .38 caliber pistol; (2) paperwork and other items relating to a .38 caliber pistol; and (3) notebooks or personal papers "recording the whereabouts" of Beckett in 1992 and 1995, when the two murders occurred.

The search warrant application included a seventeen-page affidavit detailing Beckett's alleged role as the triggerman in the two murders. The affidavit, which is described more thoroughly infra, recited the confession of James St. Jacques that he personally saw Beckett fire the rifle used in the first murder

and the pistol used in the second murder, as well as statements from other witnesses, autopsy and ballistics evidence, and record checks.

On August 16, 2001, federal and state officers executed the search warrant. In Beckett's garage, the sawed-off shotgun was discovered in plain view.

On September 19, 2001, a federal grand jury in the District of Rhode Island returned a one-count indictment charging that on or about August 16, 2001, Beckett possessed a sawed-off shotgun in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. On November 21, 2001, Beckett moved to suppress the shotgun, claiming that, inter alia, the search warrant was not supported by probable cause.

After hearing argument and taking evidence, the district court determined that there was probable cause justifying a search for a .38 caliber pistol and any paperwork relating to such a pistol.[1] It stated that "[d]espite the great length of time since the [second] murder was committed, there was still sufficient probable cause that the defendant committed the murder, and that he may well still have evidence which supports the criminal charge." Alternatively, the court held that the warrant came under the good-faith exception to the exclusionary rule announced

---

[1]The court did not reach the issue of the validity of the warrant with regard to the notebooks.

-3-

in <u>United States</u> v. <u>Leon</u>, 468 U.S. 897 (1984): "There's nothing to indicate that there was any bad faith here. And there was nothing that would indicate to any law enforcement officer that the warrant was so defective that no reasonable person would rely on that."

Following a two-day jury trial in March, 2002, Beckett was convicted of possessing the sawed-off shotgun, and on July 9, 2002, the court sentenced him to 33 months of imprisonment.

**B.      Search warrant affidavit**

The affidavit in support of the search warrant application was signed by Donald R. Beech, a detective with the Pawtucket, Rhode Island Police Department. It stated the following:

On August 13, 1992, a jogger found the body of Robert J. Laforest in a wooded area in Smithfield, Rhode Island. An autopsy revealed that he had been shot four times with a .222 or .223 caliber gun. Laforest's mother reported that she had last seen him on August 11, 1992, when he said he was going to visit a friend named James St. Jacques.

On September 15, 2000, St. Jacques confessed that he had paid Beckett $15,000 to murder Laforest. St. Jacques explained that he used Paul Ferguson as an intermediary to negotiate the contract killing with Beckett, paying Ferguson $9,000 for his role

-4-

as middleman. Beckett, who was then living in California, flew into Rhode Island shortly before the murder. St. Jacques and Ferguson met Beckett at the airport and took him to the Days Inn Hotel at India Point in Providence, where he stayed during the visit. On August 11, 1992, the day of the murder, Beckett drove St. Jacques's car to a wooded area in Smithfield, while St. Jacques remained at his own house. St. Jacques then phoned Laforest and accompanied him to the wooded area where Beckett was waiting. When Laforest got out of the truck, Beckett shot him several times with Laforest's AR 15 rifle (which had been left for safekeeping with St. Jacques). Later that day, St. Jacques took Beckett to the airport and gave him $7,500, the first half of the $15,000 fee. Ferguson, the middleman, delivered the remaining $7,500 to Beckett during an August 20, 1992 trip to California.

Also on September 15, 2000, St. Jacques made an initial confession that three years after the murder of Laforest, Beckett also killed Ferguson. He said that between the two murders, Ferguson was talking too much about the Laforest murder and was demanding money from Beckett and St. Jacques. St. Jacques said that he saw Beckett twice on the day of Ferguson's murder, October 19, 1995: once early in the day, and again that night at a local bar. At the bar, Beckett told St. Jacques, "I shot him and he will never be found." As reasons for killing Ferguson, Beckett complained to St. Jacques that Ferguson had told Beckett's former

roommate that Beckett had killed a man in Rhode Island, and that this former roommate now was attempting to blackmail him. When Beckett later discovered that Ferguson's family had reported that Ferguson was last seen on Wednesday, October 18, 1995, the day before the murder actually took place, Beckett told St. Jacques that the family's inaccurate report had given him an alibi because Beckett was at work as a prison guard on October 18 and had taken the day off on October 19.

On August 1, 2001, investigators found Ferguson's body wrapped in plastic, buried five feet under a concrete slab in Rehoboth, Massachusetts, on property that had previously belonged to St. Jacques. An autopsy disclosed that Ferguson had been shot at least four times with a weapon "consistent with a .380 caliber handgun (possibly a Llama brand)."

On August 3, 2001, two days after Ferguson's body was exhumed, St. Jacques elaborated on his earlier confession. This time, he said he had actually witnessed Beckett kill Ferguson and that he had helped him dispose of the body. According to St. Jacques, in October 1995, Beckett and Ferguson visited St. Jacques at his Rehoboth house. After Beckett accused Ferguson of "shooting off his mouth," the two got into a fight. During the fight, Beckett pulled out a black semiautomatic handgun and shot Ferguson at least three times and struck him with the butt of the gun. Beckett and St. Jacques then wrapped Ferguson's body in

-6-

plastic and dumped it into a hole that had been dug for a well. Beckett kept the gun after the murder. About a year and a half later, St. Jacques hired two men to pour concrete over the site, to make a foundation for a barn that was never built.

The affidavit set forth information corroborating multiple elements of St. Jacques's confession. As to the first murder, corroboration included St. Jacques's wife's personal observations of the first murder preparations; confirmation that Laforest owned an AR 15 rifle, which takes .223 caliber ammunition; records and witness statements concerning Beckett's travel from California and hotel stay; and confirmation of Ferguson's payment to Beckett in California. Corroboration of St. Jacques's account of the second murder included, inter alia, witnesses' confirmation of the alleged blackmail and dispute with Ferguson; Beckett's employment records showing that Beckett had been at work on October 18, 1995, and that he was off-duty on October 19, 1995; and several witnesses' statements that Beckett "regularly carried a handgun."

Finally, the affidavit supporting the warrant application also addressed Beckett's record keeping. Records and witnesses indicated that by the time of the second murder, in October, 1995, Beckett resided in Lincoln, Rhode Island, and he worked as a guard at the Wyatt Correctional Facility. He was still employed at the prison at the time of the search. Beckett

later moved to 783 High Street in Cumberland, Rhode Island, and then, at some point before the search, moved to 58 Edgewood Drive, also in Cumberland.

In February, 2001, an "ordinary citizen" with no criminal record who had known Beckett for more than two years reported that he had been inside the 783 High Street address and was "familiar with [Beckett's] habits and practices." The witness said that Beckett kept small "spiral type" notebooks in which he recorded "his whereabouts including days worked and days off," that these notebooks dated back to 1992, and that the witness had seen one notebook in particular that "records his whereabouts in 1995." The witness described Beckett as a "'pack rat' who saves everything." The affidavit stated, "Shortly after the witness saw these notebooks at the High Street address the witness became aware of the fact [that] Beckett had moved his personal possessions to his new home at 58 Edgewood Drive in Cumberland, Rhode Island." The witness also accurately described the outside of 58 Edgewood Drive.

Also in February, 2001, a second witness who had known Beckett for at least two years and was familiar with many of his habits reported that Beckett "fastidiously recorded his whereabouts" in a "spiral type" notebook that the witness had seen and that the witness was "sure that the book reflects work schedules and days off for 1995." The affidavit stated, "This

witness indicated that the books along with other personal belongings have recently been moved to 58 Edgewood in Cumberland."

## II. Discussion

### A. Probable cause

The sawed-off shotgun upon which Beckett's conviction was based was not within the scope of the search warrant. The government contends that it was lawfully seized, however, pursuant to the plain view doctrine. In Horton v. California, 496 U.S. 128 (1990), the Supreme Court defined the contours of this doctrine, holding that "an essential predicate to [the seizure of evidence not within a warrant's purview is] that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." Id. at 136. We apply de novo review to the district court's ultimate conclusion that the elements of the doctrine have been satisfied. United States v. Hamie, 165 F.3d 80, 82 (1st Cir. 1999).

Beckett contends that the officers were not lawfully present in his residence when they discovered the shotgun because the search warrant was not supported by probable cause. A warrant application must demonstrate probable cause to believe that (1) a particular person has committed a crime (the "commission" element), and (2) enumerated evidence of the offense will be found at the place to be searched (the "nexus" element). United States

v. Zayas-Diaz, 95 F.3d 105, 110-11 (1st Cir. 1996). In determining the sufficiency of an affidavit supporting a search warrant, we consider whether the "totality of the circumstances" stated in the affidavit demonstrates probable cause to search the premises. United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir. 1997). We examine the affidavit "in a practical, common-sense fashion and accord considerable deference to reasonable inferences the [issuing judicial officer] may have drawn from the attested facts." United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002) (quoting Zayas-Diaz, 95 F.3d at 111) (internal quotation marks omitted).

"In reviewing a denial of a suppression motion, the district court's ultimate legal conclusion, including the determination that a given set of facts constituted probable cause, is a question of law subject to de novo review." Khounsavanh, 113 F.3d at 282 (citing Ornelas v. United States, 517 U.S. 690, 698-99 (1996)). The district court's findings of historical fact are reviewed for clear error. Id.

If probable cause is lacking, the evidence uncovered during the execution of the search warrant normally must be excluded from the case against the defendant. United States v. Brunette, 256 F.3d 14, 19 (1st Cir. 2001). In Leon, the Supreme Court carved out an exception to the exclusionary rule, holding that "evidence obtained in objectively reasonable reliance on a

subsequently invalidated search warrant" need not be suppressed. Suppression is still appropriate, however, if the warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." 468 U.S. at 923 (quoting Brown v. Illinois, 422 U.S. 590, 610-611 (1975) (Powell, J., concurring in part)).[2]

Beckett's primary argument is that the search warrant failed to establish probable cause to believe that the items sought -- the written records and the firearm -- were located at his residence.[3]  He takes issue with the supporting affidavit's reliance on the two unnamed informants who stated that the 1992 and 1995 notebooks were located at his new residence, contending that neither witness personally observed the notebooks there and that there was little information that would help evaluate the witnesses' reliability.  Moreover, Beckett complains that there

---

[2]In Leon, the Court enumerated several other circumstances under which application of the good faith exception is inappropriate.  Id. at 923.  None of them is relevant here.

[3]In his brief, Beckett makes passing reference to an argument that the affidavit in support of the search warrant failed to establish probable cause that he had committed a crime. He did not develop this argument, however, but rather focused on the nexus element of the test for probable cause.  The government urges us to consider the commission element argument waived.  See United States v. Bongiorno, 106 F.3d 1027, 1034 (1st Cir. 1997) ("We have steadfastly deemed waived issues raised on appeal in a perfunctory manner, not accompanied by developed argumentation.").  We need not decide this, as St. Jacques's confession as well as other information in the affidavit provides ample support for probable cause to believe that Beckett had committed the murders.

-11-

was no probable cause to believe that the firearm used in the 1995 murder would still be at his residence six years later.

We agree that the application's support of a nexus between evidence of the murders and Beckett's residence is less than overwhelming. Considering the totality of the circumstances, however, we think that the affidavit established the nexus element sufficiently to pass muster under Leon.[4] The record does not contain any indication that the officers executing the warrant did so in bad faith, and the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." See Leon, 468 U.S. at 923. First, the unnamed witnesses' statements indicating that the notebooks had been moved to Beckett's current residence corroborate each other. Second, the information that Beckett was a "pack rat" supported the possibility that one or more of the specified search objects would have been retained over the years and moved to Beckett's current residence. This is particularly true of the notebooks, which can reasonably be viewed as items created for preservation.[5] Cf. United States v. Bucuvalas, 970 F.2d 937, 941 (1st Cir. 1992)

---

[4]Accordingly, we need take no position on whether the warrant application was supported by probable cause. See, e.g., United States v. Owens, 167 F.3d 739, 744-45 (1st Cir. 1999) (bypassing probable cause inquiry and affirming ruling on motion to suppress based on Leon).

[5]Indeed, the search yielded a notebook recording Beckett's whereabouts in 1995, which was introduced into evidence at the hearing on Beckett's motion to suppress, but not at trial.

(abrogated on other grounds, <u>Cleveland</u> v. <u>United States</u>, 531 U.S. 12 (2000) (business records created several years before search were deemed to have "enduring utility," thus supporting nexus determination)). Third, one unnamed witness personally viewed the notebooks at Beckett's residence on High Street in Cumberland, where they had been moved from his earlier residence in Lincoln, and both unnamed witnesses indicated that Beckett later moved his personal possessions to his current home at 58 Edgewood Drive. Accordingly, the officers could fairly infer that, having moved the notebooks once, Beckett would have moved them also to his current address.

Furthermore, although the six-year lag between the 1995 murder and the search somewhat diminishes the likelihood that Beckett would have retained the murder weapon, the fact that the body of the victim was well-hidden could have alleviated the need to dispose of the weapon. <u>Cf.</u> 2 Wayne R. LaFave, <u>Search and Seizure</u> § 3.7(d) (3d ed. 1996) ("Where the object of the search is a weapon used in the crime . . . the inference that the item[] [is] at the offender's residence is especially compelling, at least in those cases where the perpetrator is unaware that the victim has been able to identify him to the police."). St. Jacques's statement that Beckett retained the gun after the murder and the statements of several witnesses that Beckett regularly carried a handgun lent further support. Accordingly, we conclude

-13-

that the officers were lawfully present in Beckett's residence under <u>Leon</u>.

Beckett also argues that the search warrant was an "indicia warrant" seeking "mere evidence" of the murders rather than "fruits or instrumentalities" of crime, heightening the standard for probable cause. We have long since abandoned the legal distinction between mere evidence and instrumentalities. We now require only that there is reason to believe that the particular evidence to be seized "will aid in a particular apprehension or conviction." <u>Warden</u> v. <u>Hayden</u>, 387 U.S. 294, 301, 307 (1967). Here, journal entries reflecting Beckett's whereabouts or activities on or around the time of the murders would have been of obvious evidentiary significance, especially in light of St. Jacques's statement that Beckett was considering an alibi defense.

Finally, Beckett contends that even if the warrant was supported by probable cause, it was overly broad and vague, thus constituting an unconstitutional general warrant. He maintains that the warrant "gave the agents absolute discretion to search every single piece of paper belonging to Mr. Beckett and [his fiancee] Tracy Carr." We disagree.

The Fourth Amendment forbids general warrants so as to prevent law enforcement officers from rummaging through an individual's belongings at will. <u>Andresen</u> v. <u>Maryland</u>, 427 U.S.

-14-

463, 480 (1976). Contrary to Beckett's contention, the warrant did not provide the agents free rein to search all of his papers. It was limited to paperwork relating to a .38 caliber pistol and notebooks or personal papers recording the whereabouts of Beckett in 1992 and 1995. That agents may have to perform some initial screening to locate the particularized documents does not render the warrant unconstitutional.

**B. Sufficiency of the evidence**

Beckett also contends that he was entitled to acquittal because the government failed to prove that the sawed-off shotgun was covered by the statute under which he was convicted. Specifically, he argues that there was insufficient evidence that the sawed-off shotgun could "readily be restored to fire" as required by 26 U.S.C. § 5845(d). We "review all the evidence, direct and circumstantial, in the light most favorable to the prosecution, drawing all reasonable inferences consistent with the verdict, and avoiding credibility judgments, to determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt." United States v. Baltas, 236 F.3d 27, 35 (1st Cir.), cert. denied, 532 U.S. 1030 (2001).

26 U.S.C. § 5861(d) provides, in relevant part, that "[i]t shall be unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." The term "firearm" includes,

-15-

inter alia, "(1) a shotgun having a barrel . . . of less than 18 inches in length; [and] (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel . . . of less than 18 inches in length." Id. § 5845(a). The statutory definition of a shotgun includes a "weapon which may be readily restored to fire a fixed shotgun shell." Id. § 5845(d).

A review of the trial record convinces us that the government adduced sufficient evidence that the shotgun found during the search of Beckett's residence satisfied the statutory requirements. When officers searched Beckett's garage, they found in a gun locker a substantially complete shotgun: it had a stock, pistol grip and receiver, lacking only a barrel. The officers found the matching barrel elsewhere in the garage, within fifteen feet of the gun locker. The barrel had been cut down from its original length. An agent was able to screw the sawed-off barrel into the receiver portion of the gun without any difficulty in, at most, a few minutes. At trial, an agent demonstrated for the jury that he could assemble the gun in less than thirty seconds. Moreover, prior to trial, the assembled sawed-off shotgun was test-fired in a laboratory and determined to be functional.

Beckett bases his argument on a purported ambiguity in the trial testimony of crime laboratory technician Edward Downing,

who had performed the tests on the shotgun. Downing testified as follows:

> Q. Do you know if that shotgun was measured at your laboratory?
>
> A. Yes, it was.
>
> Q. And what are the dimensions of the weapon?
>
> A. The overall length is 25 inches of Item 1, and the barrel had been -- is a length of 14 and one quarter inches.
>
> Q. Was that weapon test-fired at your laboratory?
>
> A. The item was test-fired without malfunction.
>
> Q. <u>Does that mean it fired?</u>
>
> A. <u>That means it will fire.</u>
>
> Q. <u>It worked?</u>
>
> A. <u>Yes, sir.</u>

Any ambiguity as to the gun's hypothetical versus actual firing capacity in the answer "it will fire" was resolved in the subsequent exchange revealing that the shotgun "worked." Taken as a whole, Downing's testimony was sufficient to establish that the assembled sawed-off shotgun fired when tested. This testimony, in conjunction with the other evidence offered at trial, supported the jury's conclusion that the shotgun found at Beckett's residence could be "readily restored to fire a fixed shotgun shell." 26 U.S.C. § 5845(d).

-17-

As a final matter, we note that in his brief, Beckett apparently relies on the definition of a firearm contained at 18 U.S.C. § 921(a)(3): "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive . . . ."  As Beckett was tried under Title 26, not Title 18, only the former provision's requirements must be satisfied.  In any event, the requirements of the two definitions are substantially similar; in this case, both are satisfied by the evidence presented at trial.

The district court, too, used language from Title 18 (as well as from Title 26) in charging the jury.[6]  This may have been due to the fact that the original indictment cited 18 U.S.C. § 922(j), which prohibits possession of a stolen firearm.  At trial, this was dropped from the indictment, and the jury considered only the Title 26 charge.  The government points out, however, that the judgment of conviction below incorrectly states that Beckett was convicted of violating both 26 U.S.C. § 5861(d) and 18 U.S.C. § 922(j).  Accordingly, we vacate the judgment and remand to the district court for the sole purpose of correcting that error in the judgment of conviction.  We affirm the district court in all other respects.

---

[6]Beckett has waived any objection to these instructions by not presenting it below or on appeal.

For the foregoing reasons, we **AFFIRM** Beckett's conviction in part and **VACATE and REMAND** in part for further proceedings consistent with this opinion.