# United States Court of Appeals
## For the First Circuit

No. 14-1259

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT JOUBERT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Torruella, Howard, and Kayatta,
Circuit Judges.

Judith H. Mizner, Assistant Federal Public Defender, for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom John P. Kacavas, United States Attorney, was on brief, for appellee.

February 11, 2015

**KAYATTA, <u>Circuit Judge</u>**.  Robert Joubert was convicted of three counts of sexual exploitation of children, in violation of 18 U.S.C. § 2251(a), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).  On appeal, Joubert raises four issues: (1) the search warrant failed to supply a nexus to the place being searched; (2) the district court abused its discretion in admitting testimony of uncharged child molestation; (3) the Commerce Clause cannot support application to him of the federal criminal statutes under which he was indicted; and (4) his 480-month sentence was substantively unreasonable.  We affirm his conviction and sentence in all respects.

## I. Background

### A.  Investigation and Search[1]

In March 2012, a mother in Concord, New Hampshire, e-mailed York, Maine, police to complain about Joubert, a baseball coach working in the area.  Joubert used to coach and mentor the woman's son, KC.  She called Joubert a pedophile, and said that New Hampshire police previously investigated him multiple times for similar allegations.

Over the course of the next four months, an investigation by local police and the Federal Bureau of Investigation ("FBI") turned up a series of reports and complaints that Joubert molested

---

[1]  The affidavit supporting the search warrant application outlines the following details from the investigation.

or harassed various children, including the complainant. Authorities proceeded to interview many of the alleged victims, as well as their parents. They learned that Joubert engaged in a pattern of abuse, usually gaining trust within a victim's family, and then proceeding to exploit that position of trust. Law enforcement officials also learned that Joubert often photographed and videotaped his young charges. During the investigation, Joubert himself contacted police. Police and FBI interviewed him in late March, asking questions about his background, baseball pedigree, and previous employment. According to the affidavit, Joubert was "evasive" and "at times confrontational."

Starting in June 2012, the FBI and York police worked with SJ, Joubert's 36-year-old non-biological son, who claimed that Joubert molested him on two occasions in the mid-1980's. SJ reported that Joubert lived at Joubert's parents' home, in Manchester, New Hampshire. In late May or early June, SJ helped Joubert move to that address. SJ also reported that, upon learning of the investigation, Joubert became "anxious" and "very concerned" about destroying his computer's hard drive. Joubert told SJ that he was concerned about protecting "client" information. While in SJ's presence, "Joubert tore apart the computer tower." He removed components, threw away the computer tower, and then stacked the removed components inside his parents' home. SJ did not see Joubert discard the computer components.

In late June 2012, police applied for a warrant to search Joubert's parents' home. The warrant application sought permission to search for several categories of evidence including: "[a]ny and all computers or related storage devices and media"; "[a]ny and all cameras . . . including cassette tapes, VCR/VHS tapes"; and "[a]ny and all photographs, electronic images, and videos of minors/ juveniles/ youth/ youth groups that Robert Joubert has or may have had contact with." Appended to the application was a 14-page affidavit, detailing the joint FBI-police investigation into Joubert.

The affidavit chronicled the numerous complaints against Joubert, the reports of his photographing and videotaping youths, and the information conveyed by SJ, described above. In the final paragraphs of the affidavit, the officer-affiant stated that, "[b]ased on [his] training and experience, and supported by the actions of the suspect in this investigation, [he knows] that persons engaged in the molestation and exploitation of . . . minors often maintain possession and/or control of physical or electronic documents pertaining to their victims and other juveniles." The officer-affiant went on to state:

> I believe that evidence of the crime(s) of Felonious Sexual Assault exists. I believe the aforementioned evidence exists in the possession, control, care and/or custody of Robert Joubert. I believe that the evidence exists in the form of, but not limited to; physical and electronic documents and other property. The evidence may confirm or dispel

-4-

Robert Joubert's background (employment, resume claims, sport/coaching qualification and credentials), the allegation made against him involving juveniles, his travels, his relationship(s) with minors/juveniles and the victims mentioned in this affidavit, confirm his relationship with already identified victims, and identify other potential (yet unknown) victims.

Based on the affidavit, a New Hampshire judge issued a warrant to search Joubert's parents' home for "evidence of the crime(s) of Aggravated Felonious Sexual Assault . . . and other Sexual crimes[.]" On June 28, 2012, police executed that search, seizing photographs, a laptop computer, computer drives, and VHS tapes, among other items. Of the items seized, most incriminating was a pornographic VHS recording of KC and Joubert.

## B. Charged Conduct

Joubert coached KC's baseball team in Summer 2002, when KC was 9 or 10 years old. After the season ended Joubert sought to maintain a "big brother"-type relationship with KC. Joubert eventually moved into KC's home, where KC lived with his single mother. According to KC's mother, Joubert frequently videotaped her kids. After some time, Joubert started coercing KC into performing sexual favors in exchange for food or new sports equipment. Joubert became "obsessive with [KC]" and KC's mother ultimately kicked Joubert out in the summer of 2004. The seized VHS tape contained segments where Joubert places KC's hand on Joubert's penis.

On the basis of Joubert's possessing and producing a VHS tape containing child pornography, a grand jury indicted Joubert on three counts of sexual exploitation of a child to produce a visual depiction, in violation of 18 U.S.C. § 2251(a), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). Specifically, the indictment charged that on two unknown dates, between November 2002 and April 2003, and between September and August 2004, Joubert coerced KC to engage in sexually explicit conduct for the purpose of making "visual depiction[s] of such conduct, to wit, a video depicting masturbation." The indictment also charged that on an unknown date between November 2002 and April 2003, Joubert coerced KC to engage in sexually explicit conduct for the purpose of making "a visual depiction of such conduct, to wit, a video recording depicting a lewd or lascivious exhibition of [KC's] genital or pubic area."

## C. Trial and Sentencing

During pre-trial, Joubert moved to suppress items seized pursuant to the search warrant--including the VHS tape--arguing that the affidavit did not supply a sufficient nexus between the alleged crimes and the location being searched. The district court denied his motion. At trial, and over objection, the court admitted uncharged sexual misconduct testimony from SJ and two other victims, MT and NT. KC also testified during trial, identifying himself and Joubert in the illicit VHS recording.

After a three-day trial, Joubert was found guilty. The pre-sentence investigation report's Guidelines sentence was 960 months. The government recommended a 540-month sentence, but the district court varied further downward, sentencing Joubert to 480 months in prison.

## II. Analysis

### A. The Constitutionality of the Search Warrant

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Prior to executing a search, police officers, with some exceptions, must obtain a search warrant supported by probable cause to believe that (1) a crime has been committed, and (2) that "enumerated evidence of the [crime] will be found at the place to be searched--the so-called 'nexus' element." United States v. Hicks, 575 F.3d 130, 136 (1st Cir. 2009).

Joubert challenges the district court's finding that the affidavit established probable cause to search his parents' house. When evaluating the nexus between the object and the location of the search, "a magistrate [judge] has to make a practical, common-

sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Rodrique, 560 F.3d 29, 33 (1st Cir. 2009) (citations and internal quotation marks omitted). "[T]he application must give someone of reasonable caution reason to believe that evidence of a crime will be found at the place to be searched." Id. (citations and internal quotation marks omitted). The government does not need to show that the belief is "necessarily correct or more likely true than false." United States v. Lyons, 740 F.3d 702, 723 (1st Cir. 2014) (quoting United States v. Feliz, 182 F.3d 82, 87 (1st Cir. 1999)); see also Spinelli v. United States, 393 U.S. 410, 419 (1969). Nexus "can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment[,] and normal inferences as to where a criminal would hide [evidence of a crime.]" United States v. Charest, 602 F.2d 1015, 1017 (1st Cir. 1979). The reviewing court's duty is "simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238 (1983); Lyons, 740 F.3d at 723. And in making this inquiry, we focus on the facts and supported opinions in the affidavit, ignoring "unsupported conclusions." United States v. Vigeant, 176 F.3d 565, 571 (1st Cir. 1999) (citing Gates, 462 U.S. at 239).

Joubert rests his nexus challenge on four contentions. We address each contention in turn.

First, Joubert argues that a nexus is lacking because the affidavit contains no allegations that he committed any offenses at the location being searched. But Joubert misidentifies the relevant inquiry. The question is whether evidence of the crime is likely to be found in the specific place being searched, not whether the crime occurred there. See Zurcher v. Stanford Daily, 436 U.S. 547, 556-57 (1978); Feliz, 182 F.3d at 86-88 (1st Cir. 1999); see also United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009) ("There need not be an allegation that the illegal activity occurred at the location to be searched, for example the home"). As we explain below in rejecting Joubert's third argument, there was indeed such a likelihood.

Second, Joubert argues that there is no reason to believe that he would have preserved the photos and videos discussed in the affidavit. But photos and videos, by their very nature, are items customarily created for preservation. See United States v. Beckett, 321 F.3d 26, 32 (1st Cir. 2003) (noting that the fact that a notebook can "reasonably be viewed as [an] item[] created for preservation" supports the possibility that it would have been retained over the years). As such, allegations regarding photographic or video recordings do not suffer from the staleness problems that sometimes arise in other contexts. Cf. United States

v. Brooks, 594 F.3d 488, 493 (6th Cir. 2010) ("In the context of drug crimes, information goes stale very quickly because drugs are usually sold and consumed in a prompt fashion.") (internal quotation marks omitted). The nature of the items sought here supports a common-sense inference that the items would endure among Joubert's belongings. See Beckett, 321 F.3d at 32.

Third, Joubert claims that there is no reason to think he would have kept the photos at his parents' home. But the affidavit indicated that Joubert lived there, and as the Eleventh Circuit has explained:

> The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime.

Kapordelis, 569 F.3d at 1310 (quoting United States v. Green, 634 F.2d 222, 226 (5th Cir. Unit B 1981)). In addition, the affidavit indicated that SJ recently helped Joubert move his belongings to that address and that Joubert, upon learning of the investigation, became very anxious and sought SJ's help in wiping or destroying his hard drive. While at Joubert's parents' home, SJ saw Joubert "[tear] apart the computer tower," removing components; SJ did not see Joubert dispose of the removed computer components. With this

-10-

information, the magistrate judge had a substantial basis for "a practical, common-sense decision," Rodrique, 560 F.3d at 33, that evidence of child molestation would likely be found at that address.

Finally, Joubert argues that there is no reason to suspect he had any inappropriate photos because the affidavit lacked any allegations concerning child pornography or photographing sexual contacts. The affidavit's only photographing allegations are of photographing at athletic events, at the beach, or similar settings. This argument misses the mark completely. To start with, this argument is not a challenge to the nexus with the location, but rather a challenge to the specification of an object of the search.

Even allowed as such, the argument fails because photographs of any type of any of the suspected victims would provide evidence of the crimes specified. Even otherwise innocuous pictures of Joubert and his accusers would be relevant (albeit insufficient) evidence for building a case that the alleged abuse actually occurred because such pictures would preclude the possibility that Joubert never knew nor was in contact with the accusers. See Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in

-11-

determining the action.").  It therefore does not matter that the affidavit contained no allegations of child pornography.[2]

## B.  Uncharged Child Molestation Evidence

At trial, the district court admitted, over objection, testimony from three other victims, MT, NT, and SJ.  Joubert argues that, notwithstanding Federal Rule of Evidence 414, the district court erred, under Federal Rule of Evidence 403, by admitting this uncharged child molestation testimony.  He contends that the testimony was unfairly prejudicial, that it "invite[d] the jury to render a verdict on an improper emotional basis."  United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000).  Where, as here, an evidentiary objection is preserved, we review the district court's decision for abuse of discretion, "reversing if we are 'left with a definite and firm conviction that the court made a clear error of judgment.'"  United States v. Burdulis, 753 F.3d 255, 263 (1st Cir. 2014) (quoting United States v. Trenkler, 61 F.3d 45, 57 (1st Cir. 1995)).  An appellate court gives "great deference" to a district court's balancing of probative value versus unfair prejudice.  United States v. Breton, 740 F.3d 1, 14 (1st Cir. 2014).

Ordinarily, the Federal Rules of Evidence prohibit using a person's prior acts "to prove a person's character in order to

---

[2]  Finding the search warrant affidavit sufficient, we necessarily reject Joubert's second argument, that the affidavit was so patently lacking in probable cause that it cannot fall within the "good faith" exception of United States v. Leon, 468 U.S. 897 (1984).

show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1); see also United States v. Gonyer, 761 F.3d 157, 162 (1st Cir. 2014).  "The rule prohibits the prosecution from introducing evidence that is extrinsic to the crime charged solely for the purpose of showing villainous propensity."  Gonyer, 761 F.3d at 162 (internal quotation marks omitted).  Rule 414 provides an exception to this general rule in child molestation cases.  See Martínez v. Cui, 608 F.3d 54, 59 (1st Cir. 2010) (applying Rule 415, Rule 414's counterpart for civil cases); see also United States v. Davis, 624 F.3d 508, 511–12 (2d Cir. 2010); United States v. Rogers, 587 F.3d 816, 822 (7th Cir. 2009) ("Congress has said that . . . it is not improper to draw the inference that the defendant committed this sexual offense because he has the propensity to do so.").

Rule 414 provides that "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation. The evidence may be considered on any matter to which it is relevant."  This Rule 414 evidence remains subject to Rule 403's balancing between probative value and unfair prejudice.  United States v. Jones, 748 F.3d 64, 70 (1st Cir. 2014); see generally Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues,

-13-

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). District courts are to apply Rule 403 to Rule 414 evidence with a recognition that Rule 414 "reflects a congressional judgment to remove the propensity bar to admissibility of certain evidence." Cui, 608 F.3d at 59.

Joubert argues that the uncharged child molestation testimony's prejudicial effect outweighed its probative value for three reasons: (1) the allegations are old,[3] and thus not particularly probative; (2) the evidence was of limited probative value in light of the central contested issue at trial; and (3) the uncharged molestation testimony overshadowed the evidence of charged conduct, overwhelming the jury and resulting in unfair prejudice to Joubert.

First, the age of MT, NT, and SJ's allegations does not necessarily mean that the district court abused its discretion in admitting the evidence. Other courts have admitted testimony from decades earlier where that testimony showed that the defendant sought a similar type of sexual gratification. See, e.g., Davis, 624 F.3d at 512 (admitting evidence of a child molestation that occurred 19 years prior). In the context of the evidence here, the

---

[3] The abuse against MT allegedly occurred 6-9 years prior to the charged conduct. The abuse against NT allegedly occurred about 10 years prior to the charged conduct. The abuse against SJ allegedly occurred about 18-20 years prior to the charged conduct.

-14-

age of the allegations alone is insufficient to prove the district court abused its discretion.

Second, because Joubert's defense was that he did not commit the crimes against KC, evidence bearing on KC's veracity was probative to determining whether Joubert indeed produced and possessed the illicit recording. The uncharged child molestation testimony was probative of KC's veracity because it corroborated aspects of KC's testimony, particularly the nature of the abuse and Joubert's modus operandi in approaching his victims. Given these corroborating aspects of the witnesses' testimony, the district court did not abuse its discretion under Rule 403 in finding that the uncharged molestation testimony's probative value outweighed any unfair prejudicial effect.

Third, although the district court's admission of testimony from three other victims strikes us as potentially cumulative, the district court is in much better position to make such judgments. "[T]he balancing act called for by Rule 403 is a quintessentially fact-sensitive enterprise, and the trial judge is in the best position to make such factbound assessments." United States v. Vizcarrondo-Casanova, 763 F.3d 89, 94 (1st Cir. 2014) (quoting United States v. Martin, 695 F.3d 159, 165 (1st Cir. 2012)). The district court's decision here is far from "the type of 'exceptional circumstance' that calls for reversal based on such

an evidentiary ruling." Id. (quoting United States v. Houle, 237 F.3d 71, 77 (1st Cir. 2001)).[4]

To be sure, the testimony was very prejudicial.  But in light of Rule 414, we cannot say it was unfairly so.  See United States v. Morales-Aldahondo, 524 F.3d 115, 120 (1st Cir. 2008) (noting that "[i]n balancing the scales of Rule 403, it is important to note that only unfair prejudice is to be avoided, as by design, all evidence is meant to be prejudicial") (internal quotation marks omitted).

## C.  Jurisdiction

Joubert preserves for Supreme Court review an argument that the VHS tape made out-of-state--the sole connection to interstate commerce--is insufficient to support application to him of the federal criminal statutes under which he was indicted.  The federal prohibition on child pornography applies broadly to any person who:

> knowingly possesses, or knowingly accesses
> with intent to view, any book, magazine,
> periodical, film, videotape, computer disk, or
> any other material that contains an image of
> child pornography that has been mailed, or
> shipped or transported using any means or
> facility of interstate or foreign commerce or

---

[4]  Joubert also argues that the district court erred by admitting testimony from his son, SJ, which he contends was particularly prejudicial.  For the same reasons already mentioned, we do not think the unfair prejudice, if any, outweighed the probative value of SJ's testimony of uncharged child molestation.  Joubert, therefore, has not demonstrated that the district court abused its discretion.

in or affecting interstate or foreign commerce by any means, including by computer or that was produced using materials that have been mailed, or shipped or transported or in or affecting interstate or foreign commerce by any means, including by computer . . . .

18 U.S.C. § 2252A(a)(5)(B). We give de novo review to constitutional challenges to a federal statute. <u>United States</u> v. <u>Rene E.</u>, 583 F.3d 8, 11 (1st Cir. 2009).

This court recently held that the interstate commerce element is satisfied by the copying of child pornography onto a thumb drive that had traveled interstate. <u>See</u> <u>United States</u> v. <u>Burdulis</u>, 753 F.3d 255, 262 (1st Cir. 2014), <u>cert. denied</u>, 135 S. Ct. 467 (2014). Most circuits to consider the question have come to the same conclusion. <u>See</u> <u>United States</u> v. <u>Dickson</u>, 632 F.3d 186, 189-90 (5th Cir. 2011); <u>accord</u> <u>United States</u> v. <u>Caley</u>, 355 F. App'x 760, 761 (4th Cir. 2009); <u>United States</u> v. <u>Maxwell</u>, 446 F.3d 1210, 1219 (11th Cir. 2006); <u>United States</u> v. <u>Angle</u>, 234 F.3d 326, 341 (7th Cir. 2000); <u>United States</u> v. <u>Lacy</u>, 119 F.3d 742, 750 (9th Cir. 1997). Indeed, Joubert correctly conceded at oral argument that we would have to overturn our decision in <u>Burdulis</u> to rule in his favor on this issue. No relevant distinction suggests that a VHS tape as employed here provides less of a nexus to interstate commerce than the thumb drive in <u>Burdulis</u>. We therefore find the rejection of Joubert's challenge prescribed by our earlier decision in <u>Burdulis</u>. <u>See</u> <u>United States</u> v. <u>Wogan</u>, 938 F.2d 1446, 1449 (1st Cir. 1991) ("[P]rior panel decisions are binding upon newly

-17-

constituted panels in the absence of supervening authority sufficient to warrant disregard of established precedent.").

## D. 480-Month Sentence

Finally, Joubert challenges the substantive reasonableness of his 480-month sentence. We review the substantive reasonableness of a sentence for an abuse of discretion. United States v. King, 741 F.3d 305, 307-08 (1st Cir. 2014). "[T]he linchpin of a reasonable sentence is a plausible sentencing rationale and a defensible result." United States v. Martin, 520 F.3d 87, 96 (1st Cir. 2008). "We remember that there is no single reasonable sentence in a particular case but, rather, a universe of reasonable outcomes." United States v. Batchu, 724 F.3d 1, 13 (1st Cir. 2013) (internal quotation marks omitted). "When, as in this case, a district court essays a substantial downward variance from a properly calculated guideline sentencing range, a defendant's claim of substantive unreasonableness will generally fail." United States v. Floyd, 740 F.3d 22, 39–40 (1st Cir. 2014).

In making this challenge, Joubert argues several points: (1) that the district court gave short shrift to mitigating factors; (2) that his sentence is statistically longer than the national average; and (3) that a 480-month sentence is an effective life term for 60-year-old Joubert, and thus is too harsh.

Joubert points to several mitigating factors that he thinks the district court underappreciated: his advanced age, his obligations to elderly parents, the non-violent nature of his recordings, and the fact that he never distributed the illicit recordings. But the district court did explicitly consider such factors. It weighed Joubert's mitigating factors against his aggravating factors, including that he repeatedly, over the course of decades, used his coaching positions to sexually abuse minors. "That the sentencing court chose not to attach to certain of the mitigating factors the significance that the appellant thinks they deserved does not make the sentence unreasonable." United States v. Clogston, 662 F.3d 588, 593 (1st Cir. 2011). The significance given to each relevant factor is for the district court, not an appellate court, to decide. United States v. Dixon, 449 F.3d 194, 205 (1st Cir. 2006).

Even if sex offenders have, on average, shorter sentences than Joubert, that tells us little about the substantive reasonableness of Joubert's sentence. "A well-founded claim of disparity . . . assumes that apples are being compared to apples." United States v. Mateo-Espejo, 426 F.3d 508, 514 (1st Cir. 2005). By pointing to national statistics, Joubert compares the sentence for his unique offense to the average sentence for others convicted under the same federal statute. A range of conduct is covered under criminal statutes like 18 U.S.C. §§ 2251(a), 2252A(a)(5)(B).

This comparison is thus unhelpful for determining the substantive reasonableness of Joubert's sentence for his unique crime. See Dixon, 449 F.3d at 205 (noting that "sentencing determinations hinge primarily on case-specific and defendant-specific considerations"). Moreover, Joubert is far from alone in receiving a lengthy sentence for similar conduct. See, e.g., United States v. Klug, 670 F.3d 797, 800 (7th Cir. 2012) (holding that a 384-month sentence for producing child pornography depicting "children dressing and undressing" was reasonable).

Finally, the fact that a 480-month sentence is just as much a life term for 60-year-old Joubert as a 960-month sentence does nothing to establish that Joubert's 480-month sentence was substantively unreasonable. The sentencing of a defendant involves more considerations than simply the effect of that sentence on the defendant. See 18 U.S.C. § 3553(a)(2). The district court may consider the perception and effect that the punishment may have on the general public, even if for the defendant, the practical effect is minimal or non-existent. See, e.g., United States v. Politano, 522 F.3d 69, 74 (1st Cir. 2008). Noting the "compulsive" nature of Joubert's behavior, the district court purposefully fashioned the sentence so that Joubert would never again have contact with young boys. That certainly is a plausible rationale for a defensible result. See Martin, 520 F.3d at 96. We thus find that the

district court did not abuse its discretion in sentencing Joubert to 480 months.

## III.  Conclusion

For the aforementioned reasons, we <u>affirm</u>.

**- Concurring Opinion Follows -**

**TORRUELLA, Circuit Judge (Concurring).** I join the court's opinion in full but write separately to note my disagreement with the state of our Commerce Clause jurisprudence.

It seems counterintuitive that interstate commerce is affected when Joubert purchases a VHS videotape in New Hampshire, records on the VHS videotape in New Hampshire, and neither sells nor attempts to sell the VHS videotape outside of New Hampshire. Indeed, the only argument in support of a connection to interstate commerce is that, in aggregate, this type of behavior has an effect on interstate commerce. This borders on the farcical, as the evidence suggests that the content of the videotape was made exclusively for Joubert's own personal use. Any commonsense understanding of "interstate commerce" excludes the conduct at issue here.

Yet, as the court correctly notes, and Joubert himself concedes, this court and most (if not all) of the other circuits have found this connection perfectly acceptable, and thus constitutional. See ante, at 17 (collecting cases from other circuits). This "link" to interstate commerce, which is tenuous at best, also effectively gives the federal government unlimited jurisdiction, since there is very little in today's society that, when aggregated, would have no impact on interstate commerce. We have put aside common sense in order to federalize conduct which we believe needs to be punished.

Let there be no doubt: I am in full agreement that the behavior Joubert was convicted of must be punished, and punished harshly. This punishment, however, should be meted out by the state under its plenary police power, and not by the federal government with its limited jurisdictional reach.[5] See United States v. López, 514 U.S. 549, 552 (1995) ("The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." (quoting The Federalist No. 45, at 292-93 (James Madison) (Clinton Rossiter ed., 1961))).

Recent Supreme Court cases suggest a push in this direction. See, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2591 (2012) ("Although the [Commerce] Clause gives Congress authority to legislate . . . , it does not license the exercise of any great substantive and independent power[s] beyond those specifically enumerated. Instead, the Clause is merely a declaration . . . that the means of carrying into execution those [powers] otherwise granted are included in the grant." (second and third alterations in the original) (internal citations and quotation marks omitted)); United States v. Morrison, 529 U.S. 598,

---

[5] This is not a situation where if the federal government did not have jurisdiction, the crime would go unpunished. The investigation began with police in York, Maine, and it continued as a joint state/federal task force. I have little doubt that had the FBI not been involved and had not brought these federal charges, state prosecutors would have brought charges.

617-18 (2000) ("We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local."); López, 514 U.S. at 567 ("Respondent was a local student at a local school; there is no indication that he had recently moved in interstate commerce, and there is no requirement that his possession of the firearm have any concrete tie to interstate commerce."). Given this trend of narrowing the reach of the Commerce Clause, I believe this court should reevaluate its precedents and lead the return to a more faithful reading of the term "interstate commerce."