UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


United States of America

    v.                           Crim. No. 16-91-01-JL
                                   Opinion No. 2017 DNH 223

Brad Smith

## **ORDER ON MOTION TO SUPPRESS**


The suppression issues in this criminal case involve a United States Magistrate Judge's authority to issue a search warrant under the Stored Communications Act, 18 U.S.C. § 2703, as well as law enforcement investigators' entry onto a gated farm property prior to questioning a suspect and conducting a consent search of his home.

Defendant Brad Smith was charged with six counts of sexual exploitation of children in violation of 18 U.S.C. § 2251(a). Smith was accused of making six video recordings of himself raping the three-year old daughter of his employer, at whose home Smith was working when he committed the assault. Smith moved to suppress evidence obtained, pursuant to a search warrant issued by a federal Magistrate Judge in the Eastern District of Michigan, from his email account that first put investigators on his trail. He also sought suppression of evidence seized during a consensual search from his residence in Louisiana, including the computer and external hard drive upon

which the charged videos and other child pornography were located, as well as clothing and other items which linked him to the crime.  Finally, Smith moved to suppress statements he made to law enforcement agents contemporaneous with the search as well as his video-recorded confession.  He argues that:  1) the Magistrate Judge did not have jurisdiction to issue the warrant; 2) his consent to enter his home and seize his property was not knowingly, voluntarily, intelligently, or freely given and resulted from officers' illegal entry onto his property; 3) he was in custody during the search of his residence and was not given Miranda warnings before making any statements, and those statements were the product of unlawful coercion; and 4) his later pre-confession Miranda waiver was also unlawfully coerced, and was the fruit of the poisonous tree.

After a two-day evidentiary hearing which included testimony from three investigating officers and the defendant himself, the court denied the motion.  This details the basis for that ruling. See, e.g., United States v. Joubert, 980 F. Supp. 2d 53, 55 & n.1 aff'd, 778 F.3d 247 (1st Cir. 2015) (citing In re Mosley, 494 F.3d 1320, 1328 (11th Cir. 2007)) (noting a district court's authority to later reduce its prior oral findings and rulings to writing).  As fully explained below, the Magistrate Judge had jurisdiction to issue the search warrant, Smith's consent to search was valid, and the

introduction of Smith's statements did not violate the Fifth
Amendment.

I.  **BACKGROUND**

Based upon the parties' briefing and the testimony and
other evidence presented at the hearing, the court makes the
following factual findings.  In early 2014, federal agents
located child pornography in an email account belonging to an
individual -- known by the initials "T.D." -- living in Ann
Arbor, Michigan.  A search of T.D.'s residence yielded child
pornography stored electronically.  T.D. also admitted that he
used his email account to trade child pornography.  Further
review of T.D.'s email account revealed that T.D. had received
two child pornography videos and an offer of 70 more from the
email address "smittyb172@yahoo.com."  The sender identified the
female minor in the video recordings as his daughter.

Based on this information, Special Agent Desvallons
Desmarets of Homeland Security Investigations (HSI)[1] in Detroit,
Michigan, issued an administrative subpoena to Yahoo! in late
October 2015, for subscriber records pertaining to the e-mail
account smittyb172@yahoo.com.  Before Yahoo! responded to the
administrative subpoena, however, Magistrate Judge Elizabeth

---

[1] Various officials testified that HSI is the agency responsible
for investigating child pornography in the United States.

3

Stafford of the Eastern District of Michigan issued a search warrant, authorizing the search and seizure of the content of the smittyb172@yahoo.com account. Complying with the latter subpoena, Yahoo! produced to law enforcement the content of the smittyb172@yahoo.com e-mail account, including subscriber information and IP addresses related to the account's user logins. The e-mail account was registered to an individual named Brad Smith of Concord, New Hampshire, with a birth date in November 1983. In January 2016, law enforcement databases tracked Smith to a pecan farm in Breaux Bridge, Louisiana, familiar to members of local law enforcement. The investigation was referred to Special Agents Lance Lopez and Erol Catalan of HSI in Louisiana, and Investigator (now Trooper) Georgiana Kibodeaux of the Louisiana State Police for further action.

On January 6 and 7, 2016, Agent Lopez conducted surveillance of the pecan farm where authorities believed Smith was located. The farm abuts Main Highway, with most of its boundary demarcated by an open, see-through fence comprised of metal poles set far enough apart for adults to step through. As his surveillance could not confirm Smith's presence, Agent Lopez called a contact phone number posted adjacent to the driveway and inquired about tours. Although the individual who answered the phone said the farm was not currently offering tours, he identified himself as Brad Smith.

4

A few days later, Agent Lopez spoke with an Assistant United States Attorney about obtaining a search warrant. The two determined that the information in Lopez's possession -- Smith's Yahoo! emails -- was probably too "stale" to support a search warrant. Employing a different tack, Lopez, Catalan and Kibodeaux returned to the pecan farm on January 14, 2016, to conduct a "knock-and-talk," interview,[2] intending to make contact with Smith. Although a see-through gate similar in design to the perimeter fence blocked their vehicle from entering the driveway, an adjacent sign provided a phone number for deliveries and a key-pad for calling the number. When no one answered, Lopez and Kibodeaux stepped through one of the many openings in the gate. After stepping through the gate, Kibodeaux realized the there was enough "give" in the gate's two overlapping sections that they could be parted enough to have walked between them.[3] The two then proceeded down the long driveway that bisected large open fields of pecan trees.

---

[2] A knock-and-talk is an investigative procedure where "officers who have not yet secured a warrant go to investigate a suspected crime and determine whether the suspect will cooperate." United States v. Paneto, 661 F.3d 709, 712 (1st Cir. 2011).

[3] Def. Exh. E2. Smith disputed this claim when he later testified, but the court credits Kibodeaux's testimony on this point based on her general credibility and the physical evidence involved. See supra Part II.B.2.n.17.

Kibodeaux received no answer when she knocked on the door of the main farmhouse.[4]  But immediately thereafter, she and Lopez heard the sound of farm equipment behind a large, open, carport-style garage further down the driveway.  Walking toward the sound, they saw a male sitting on a piece of heavy equipment and a woman standing nearby with a shovel.  Over the din of the equipment, Lopez attracted the male's attention by waving his

---

[4] The defendant viewed this point as significant enough to warrant his own directly contradictory testimony, attempting to undermine Kibodeaux's credibility by testifying that he "knew for a fact" that the residents of the main house were home because one of the home's elderly residents was in the house near the front door "all the time" and therefore that Kibodeaux's knock would not have gone unanswered.  Suppression Tr., doc. no. 43, at 21-22.  Smith provided no affidavit or testimony from the residents to support this assertion.  Nor did he swear in his own detailed affidavit that the residents were home.  Doc. no. 19-3.  Without shifting the burden of proof on suppression, it is reasonable to assume that the defense would have provided such evidence if it was in a position to establish that the main house residents were actually home at the time. Cf., United States v. Savarese, 649 F.2d 83, 87 (1st Cir. 1987) (noting that the government, in its response to a criminal defendant's theory of defense, has some leeway to comment on the defendant's failure to produce evidence supporting the defendant's stated theory). It is also reasonable to assume that, if they were home, the main house residents would have at some point inquired as to why the three investigators were on the property in the driveway in front of the house.  Given lack of evidence to support defendant's assertion, the court credits the testimony of Lopez and Kibodeaux on this point.  This juxtaposition between credible testimony by the investigators and less credible testimony by the defendant (similar to the conflict regarding the gate), inter alia, has lead the court to credit the investigators' testimony, both in general and especially where it conflicts with the defendant's testimony.

arms.  The male -- who turned out to be Smith -- got off the equipment he was using, and walked toward the front of the garage where Lopez and Kibodeaux were standing.  Lopez identified both he and Kibodeaux as law enforcement officials and presented Smith with the "wallet" containing his badge and credentials, which Smith examined before returning it to Lopez.  Kibodeaux was wearing official Louisiana State Police clothing emblazoned with a badge and was wearing her official badge as well.

Lopez engaged him in conversation by explaining that it was part of his job with HSI to inquire about the possible employment of immigrants on area farms and whether any were currently working there.[5]  The male identified himself as Brad Smith and showed the agents his New Hampshire driver's license.  Acceding to the agents' request, Smith then provided the agents with the driveway gate's access code so that Agent Catalan could drive, rather than walk, up the driveway.  As they stood in the driveway while Catalan drove its length up to the house, Agent Lopez asked Smith if he had a personal email account.  Smith

---

[5] Smith testified that the agents said they were investigating illegal immigration, specifically, that they were "looking for Mexicans."  The court credits the agents' testimony on this issue.

identified two -- one of which was the targeted account, smittyb172@yahoo.com.

Agent Lopez informed Smith that there were other issues that needed to be addressed. Given the sensitive nature of the subject matter of the investigation (child pornography), Lopez asked Smith if he was willing to speak with them privately inside his home. The defendant agreed, and walked the investigators across the property to his residence, which was a bungalow behind the main farmhouse. Smith's bungalow was almost completely surrounded by a solid wood fence, which, unlike the fence surrounding the entire farm, could neither be seen through nor walked through. The adult woman initially observed with Smith outside beyond the compound of buildings did not accompany the defendant and the investigators into the bungalow.

Smith told the agents that he lived alone in the small, three-room bungalow and that the former property owners were still residing in the larger house until they secured a new residence. Upon entering the bungalow with Smith, the investigators immediately informed Smith that they were investigating the possible possession and distribution of child pornography. Lopez asked Smith if he owned any computers, and if he used those computers to view pornography. Smith indicated that his laptop computer was in his bedroom, the only room on the home's upper level. He acknowledged that he used that

computer to view pornography.  When Lopez inquired further about child pornography, Smith initially stated that he had unintentionally encountered and accidentally downloaded child pornography while seeking legal, adult pornography.  He admitted that there was child pornography stored in a file on his computer, but said that he intended to remove the files with a professional erasure program.

After being informed that there was child pornography on Smith's computer, Lopez requested Smith's consent to seize and search the computer.  Smith inquired about the consequences if he refused, and Kibodeaux explained that she believed that Smith's earlier admission about his electronic storage of child pornography constituted sufficient probable cause to obtain a search warrant to search the computer.  She stated that she would temporarily seize the device and apply for a search warrant with a judge, explaining that the decision to issue a warrant belonged to the judge.[6]  Kibodeaux told Smith that he had the right to refuse his consent.  Smith consented to the search.

Investigator Kibodeaux proceeded upstairs to Smith's bedroom -- the only upstairs room -- where she saw a laptop

---

[6] Smith testified that the agents told him that they already had a warrant and that they would "make his life miserable" if he didn't consent.  The court credits the agents' testimony that that no such threats were made and that they would apply for a warrant if he refused consent.

computer with an attached external hard drive, and a second external hard drive resting nearby. She called down and asked about the external hard drives. Smith stated that he had previously used both external hard drives, but no longer used the external hard drive that was unplugged from the laptop computer. He nevertheless consented to the seizure of all three devices -- the laptop and the two external drives -- and Investigator Kibodeaux took possession of them.[7]

In response to Agent Catalan's question about recent exposure to child pornography, Smith said that he had used an internet forum to view and download child pornography. He further indicated that he was aware of other sources of child pornography on the internet. Smith also told the agents that he would never hurt anyone, and compared his interest in child pornography to homosexuality in that it was a natural biological urge. He then asked, perhaps rhetorically, whether he should be speaking with the investigators. Agent Catalan reminded Smith that he could end the interview at any time.

Agents Catalan and Lopez then asked the defendant if he would be willing to travel to the HSI office to speak more about his sources of child pornography. Smith raised the issue of the

---

[7] Agent Catalan began making an audio recording of the encounter beginning approximately at the time Investigator Kibodeaux returned from Smith's bedroom.

value of whatever information he provided as a "bargaining chip." Lopez explained that if the defendant retained an attorney, the Assistant United States Attorney handling the investigation would contact that attorney to discuss any information that Smith could provide. Smith declined to travel to the HSI office with the agents. Agent Catalan inquired where the images of child pornography would be found, and Smith indicated that they were on the laptop computer and provided Catalan with his username and password.

Before leaving the farm, Lopez asked the defendant for his consent to search the laptop computer and the two external hard drives, and explained the consent process. Agent Lopez showed the defendant a consent-to-search form, and read the form aloud. He further informed Smith that he had a right to revoke his consent at any time. Smith signed the form, indicating that: 1) he was doing so voluntarily; 2) authorized the seizure and search of his computer and related hardware; and 3) confirming his awareness of his right to refuse and/or withdraw his consent. He relinquished the computer and hard drives, at which time Lopez provided him with a property receipt.

At some point during the course of the interview, the investigators noticed pictures of a young girl on the defendant's refrigerator. The defendant identified the girl

(the minor victim) by name, and explained that he was close with her family.

Upon returning to his office, Agent Catalan initiated a forensic review of one of the external hard drives, which required entry of a password.  Agent Lopez called Smith and he provided the password during a brief conversation.  Using the password, Agent Catalan located videos of child pornography on the drive, including videos which appeared to depict the rape of the same child in the pictures on the defendant's refrigerator.  Suspecting that the defendant had manufactured the videos, the investigators decided to arrest him.  Agent Lopez called Smith and informed him that he could pick up his devices at the Louisiana State Police Office.  When the defendant arrived at the State Police Office, he was met by four Louisiana state troopers, including Investigator Kibodeaux.  Only Investigator Kibodeaux wore a visible firearm in the typical side-holster.  The remaining officers were carrying weapons underneath their business-casual clothing.

Smith was placed in an interview room, which was being audio-video recorded, and Investigator Kibodeaux immediately informed the defendant that he was being detained and was not free to leave.  When read his Miranda warnings, Smith indicated that he had questions about them.  Investigator Kibodeaux then walked through each of the defendant's individual rights, and

asked him, one by one, whether he understood them. He indicated that he did, and proceeded to engage in an audio-video recorded interview. During that interview, Smith acknowledged that he had consented to the seizure of his electronic devices, admitted to possessing child pornography, and explained in detail why he was drawn to the material. Investigator Kibodeaux then confronted the defendant with a still image of the victim from one of the charged child pornography videos, and Smith admitted that he had videotaped himself raping her in New Hampshire the previous May.

## II.  ANALYSIS

Smith makes several arguments in support of suppression. First, he asserts that Magistrate Judge Stafford in the United States District Court for the Eastern District of Michigan did not have jurisdiction to issue a search warrant for information located in the Northern District of California. He next argues that the warrantless seizure of his laptop violated the Fourth Amendment because the agents illegally walked up the driveway through the gate at the end of the driveway and because his consent was not voluntary due to the agents' use of a ruse to enter the property and thereafter by their show of force. Finally, Smith claims that his Fifth Amendment rights were violated because he was not given Miranda warnings prior to the

13

questioning at his home, and because his recorded confession was impermissibly obtained by conditioning his ability to leave the police station on his Miranda waiver.  The court turns first to the validity of the search warrant.

A.    **Jurisdiction to issue the search warrant**

"vidence obtained during a search may be tainted by the illegality of an earlier Fourth Amendment violation, so as to render such evidence inadmissible as 'fruit of the poisonous tree.'"  United States v. Camacho, 661 F.3d 718, 728 (1st Cir. 2011).  Smith argues that the search warrant directed to Yahoo! In California was void ab initio because the Magistrate Judge in the Eastern District of Michigan lacked the legal authority to issue a warrant pertaining to a search outside of that district. Accordingly, he argues, all evidence seized from Smith's residence should be suppressed.  He cites Fed. R. Crim. P. 41(b)[8]

---

[8]Although amended in 2016 in ways not germane here, Fed. R. Crim. P. 41(b), then captioned "Authority to Issue a Warrant," stated as follows during the relevant time period:

> (1) a magistrate judge with authority in the district --
> or if none is reasonably available, a judge of a state
> court of record in the district -- has authority to
> issue a warrant to search for and seize a person or
> property located within the district;

> (2) a magistrate judge with authority in the district
> has authority to issue a warrant for a person or
> property outside the district if the person or
> property is located within the district when the

which, as the government concedes, ordinarily limits a

Magistrate Judge's authority to issue warrants to search and

seize property located within the issuing district.

Here, as the government notes, the warrant was issued under

warrant is issued but might move or be moved outside the district before the warrant is executed;

(3) a magistrate judge--in an investigation of domestic terrorism or international terrorism--with authority in any district in which activities related to the terrorism may have occurred has authority to issue a warrant for a person or property within or outside that district;

(4) a magistrate judge with authority in the district has authority to issue a warrant to install within the district a tracking device; the warrant may authorize use of the device to track the movement of a person or property located within the district, outside the district, or both; and

(5) a magistrate judge having authority in any district where activities related to the crime may have occurred, or in the District of Columbia, may issue a warrant for property that is located outside the jurisdiction of any state or district, but within any of the following:

   (A) a United States territory, possession, or commonwealth;

   (B) the premises--no matter who owns them--of a United States diplomatic or consular mission in a foreign state, including any appurtenant building, part of a building, or land used for the mission's purposes; or

   (C) a residence and any appurtenant land owned or leased by the United States and used by United States personnel assigned to a United States diplomatic or consular mission in a foreign state.

15

the Stored Communications Act, 18 U.S.C. § 2703, which provides:

> A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure (or, in the case of a State court, issued using State warrant procedures) by a court of competent jurisdiction.

18 U.S.C. § 2703(a). Sections 2703(b) and (c), in turn, authorize "a court of competent jurisdiction" to issue warrants to search and to seize electronic communications and remote computing services. "Court of competent jurisdiction," is then defined to include "any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that ... has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). The statutory authorization contained in § 2703 is important because Fed. R. Crim. P. 41(a)(1) defines the scope of Rule 41 as "not modify[ing] any statute regulating search or seizure, or the issuance and execution of a search warrant in special circumstances."

Here, the Eastern District of Michigan was indisputably a "court of competent jurisdiction" because the warrant that led to Smith's arrest stemmed from federal law enforcement's investigation of violations of federal child pornography laws

16

occurring in, and committed by, an individual located in Ann Arbor, Michigan.

Moreover, as defense counsel acknowledged during the suppression hearing, while the First Circuit Court of Appeals has not addressed the issue, other Circuit and District courts have unanimously found that the jurisdictional strictures of Rule 41(b) are substantive, rather than procedural, and therefore do not apply to warrants issued under § 2703. See, e.g., United States v. Bansal, 663 F.3d 634, 662 (3d Cir. 2011) (holding that Magistrate Judge in the District of Pennsylvania had authority to issue warrants for stored electronic communications located in California, in part because Rule 41(b) does not limit a magistrate's jurisdiction pursuant to § 2703(a)); United States v. Berkos, 543 F.3d 392 (7th Cir. 2008) ("Rule 41(b) deals with substantive judicial authority -- not procedure -- and thus does not apply to § 2703(a)"); United States v. Bundy, 195 F. Supp 3d 1170, 1173 (D. Or. 2016) ("[t]he territorial limitation in Rule 41 . . . does not limit warrants issued pursuant to § 2703); United States v. Kanodia, Crim. No. 15-10131-NMG, 2016 WL 3166370, at *3 (D. Mass. June 6, 2016) (holding that Magistrate Judge in the District of Massachusetts had authority to issue federal search warrant for stored electronic communications in another district, because Rule 41(b)'s provisions do not apply to § 2703(a)); United

States v. Scully, 108 F. Supp. 3d 59 (E.D.N.Y. 2015) (finding that Rule 41(b) does not limit a magistrate judge's territorial jurisdiction under § 2703(a)); United States v. Kernell, No. 3:08-CR-142, 2010 WL 1408437, at *4 (E.D. Tenn. April 2, 2010) ("This Court . . . finds that Rule 41(b) is not a 'procedural' provision, but is a 'substantive' provision, and thus, it is not incorporated under 18 U.S.C. § 2703(a)."); In re Search of Yahoo, Inc., No. 07-3194-MB, 2007 WL 1539971, at *7 (D. Az. May 21, 2007) ("Rule 41(a) expresses Congress' intent that Rule 41(b) does not limit a district court's authority granted in § 2703(a)."); cf. United States v. Barber, 184 F. Supp. 3d 1013, 1017-18 (D. Kan. 2016) (finding lack of jurisdiction because offense did not occur in issuing Magistrate's District, but noting that "[W]hen the [Stored Communications Act] applies, a Magistrate Judge with jurisdiction over the offense being investigated can issue a warrant to be executed outside of that judge's ordinary jurisdiction, using the procedures of Rule 41, but not constrained by the jurisdictional limitation of Rule 41(b)).[9]

---

[9] While Smith cites cases in which evidence was suppressed in support of his argument that the warrant was void ab initio, all those cases involve only Fed. R. Crim. P. 41(b), and not another statute which would trigger Rule 41(a) and provide a source of authority to issue an out-of-district warrant. See, e.g., United States v. Krueger, 809 F.3d 1109 (10th Cir. 2015); United States v. Levin, 186 F. Supp. 3d 26 (D. Mass. 2016), appeal

Based on the language of both Rule 41 and § 2703, as well as the unanimity of authority, the court finds that Magistrate Judge Stafford did not exceed her jurisdiction when issuing the search warrant targeting Yahoo! in California.[10]

**B.    Fourth Amendment**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Am. IV.  Generally, the Fourth Amendment "requires police officers to secure a search warrant supported by probable cause prior to effecting a search or seizure." United States v.

---

docketed, No. 16-1567, (1st Cir. May 20, 2016).  They are thus inapposite.

[10] Given the court's finding that the Magistrate Judge acted within her authority, the court does not reach either of the government's alternative arguments:  1) that the good faith exception to the exclusionary rule set forth in United States v. Leon, 468 U.S. 897 (1984) should apply; or 2) that suppression is not required because the administrative subpoena would have led to the knock-and-talk interview and the inevitable discovery of the charged video recordings on Smith's computer.  See United States v. Almeida, 434 F.3d 25, 28 (1st Cir. 2006) ("The inevitable discovery exception recognizes that, if the evidence would have been discovered lawfully, 'the deterrence rationale has so little basis that the evidence should be received.'") (citing Nix v. Williams, 467 U.S. 431, 444 (1984).

Gifford, 727 F.3d 92, 98 (1st Cir. 2013). It is a "'basic principle of Fourth Amendment law' that searches and seizures inside the home without a warrant are presumptively unreasonable[.]" Groh v. Ramirez, 540 U.S. 551, 559 (2004) (quoting Payton v. New York, 445 U.S. 573, 586 (1980) (footnote omitted)).

Smith does not dispute the well-established proposition that "[c]onsent is an 'established exception[ ]' to the Fourth Amendment warrant requirement." United States v. Casellas-Toro, 807 F.3d 380, 391 (1st Cir.2015) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). He argues instead that his consent was invalid because Agent Lopez and Investigator Kibodeaux first illegally trespassed onto the farm, and then, along with Agent Catalan, improperly coerced his consent with deception, trickery and an improper show of force. The government bears the burden of proving by a preponderance of the evidence that Smith voluntarily gave consent. United States v. Diaz, 494 F.3d 221, 225 (1st Cir. 2007).

None of Smith's claims withstand scrutiny. The driveway where the agents entered the property was not part of the farm's curtilage, and thus not within the protection afforded by the Fourth Amendment. Even if the driveway was part of the curtilage, however, the gate at the driveway's end did revoke the implied license to enter the curtilage belonging to all

20

members of the public, including police officers seeking to engage in a knock-and-talk interview. In addition, the evidence presented at the suppression hearing unequivocally demonstrates that the government met its burden to show that Smith's oral consent to enter the bungalow and search it, and his written consent to seize and search his computer and related hardware was voluntary and not the product of unlawful coercion.

1. Entrance onto the farm

Smith's first argument is that the investigating agents violated the Fourth Amendment by illegally entering the farm through the gate at the end of the driveway. Smith's brief assumes, without analysis, that the driveway is protected by the Fourth Amendment because it is part of the property's curtilage.[11] The court does not make the same assumption. The appropriate analysis demonstrates that the curtilage does not extend to the end of the driveway.

"A search within the meaning of the Fourth Amendment 'occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.'" United States v. D'Andrea, 648 F.3d 1, 5-6 (1st Cir. 2011) (quoting Kyllo v. United States, 533 U.S. 27, 33 (2001)). Not all of an individual's property, however, is protected by the Fourth

---

[11] Defendant's Suppression Memo., doc. no. 19, at 17-18.

Amendment from warrantless searches.  Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013); Oliver v. United States, 466 U.S. 170, 176, 178 (1984).  A person's house, along with the area closely associated with the house, known as the curtilage, are protected.  Open fields, including any unoccupied areas outside of the curtilage, are not.  Jardines, 133 S. Ct. at 1414-15; United States v. Dunn, 480 U.S. 294, 304 (1987); Oliver, 466 U.S. at 180.  In United States v. Jones, 565 U.S. 400 (2012), the Court reiterated this "open field" doctrine, noting that the Fourth Amendment is not concerned with "any technical trespass that led to the gathering of evidence"; rather, it "protects against trespassory searches only with regard to those items ('persons, houses, papers, and effects') that it enumerates." Id. at 411 n.8 (emphasis in original) (internal quotations and citation omitted); see Oliver, 466 U.S. at 173 ("The 'open fields' doctrine, first enunciated . . . in Hester v. United States, permits police officers to enter and search a field without a warrant.").  Thus, the government's information-gathering intrusion in a space that "is not one of those protected areas," though technically trespass at common law, "is of no Fourth Amendment significance."  Jones, 565 U.S. at 411.

   "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and

psychologically, where privacy expectations are most heightened." California v. Ciraolo, 476 U.S. 207, 212-13 (1986); Jardines, 133 S. Ct. at 1415.  Whether an area is part of the home's curtilage "should be resolved with particular reference to four factors:  the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." Dunn, 480 U.S. at 301; United States v. Diehl, 276 F.3d 32, 38-39 (1st Cir. 2002).  In contrast, any area of private property outside the curtilage is not part of the house and, therefore, is not protected. Jones, 132 S. Ct. 958-59.  Ultimately, however, these factors do not constitute "a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions." Dunn, 480 U.S. at 301.  They are instead "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration -- whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id.

Here, considering both the Dunn factors and what the Dunn Court described as the "centrally relevant question," the court

concludes that the end of the farm's driveway is not protected curtilage.

While our Court of Appeals has noted that the curtilage analysis "depends on the facts of the case," Rosencranz v. United States, 356 F.2d 310, 313 (1st Cir. 1966), and has rejected the argument that driveways can never fall within a home's curtilage, Diehl, 276 F.3d at 39, it has described "a number of general principles with respect to driveways." United States v. Brown, 510 F.3d 57, 65 (1st Cir. 2007). For example, "[i]f the relevant part of the driveway is freely exposed to public view, it does not fall within the curtilage." Id. (citing United States v. Roccio, 981 F.2d 587, 591 (1st Cir. 1992) (footnote omitted)). The court in Brown further observed that

> in order for a part of a driveway to be considered within the home's curtilage, public viewing of it must be, at most, very infrequent. The remoteness of the relevant part of the driveway and steps taken by the resident to discourage public entry or observation militate toward a finding that it falls within the curtilage.

Id. The court synthesized this observation from, inter alia, its decision in Diehl, in which it found the relevant part of the driveway to be within a property's curtilage

> where it was reached only by proceeding 700 feet along discontinued town road and then 500 feet along the driveway; residents had posted 'no trespassing' signs at its entrance, had their mail delivered to a post office box in town, and had instructed United Parcel

24

> Service to leave parcels at a store; and members of
> the public hardly ever entered.

Brown, 510 F.3d at 65 (citing Diehl, 276 F.3d at 41).

Here, while there was some divergent testimony at the suppression hearing as to the precise distance, the testimony established that the end of the driveway was 300-500 yards from the house and "is freely exposed to public view" by virtue of its proximity to Main Highway. While proximity, standing alone, is not dispositive, id., this distance militates against finding it within the curtilage. See Dunn, 480 U.S. at 302 (describing as a "substantial distance" a barn 60 yards away from a house, and finding that the distance "supports no inference" that it should be treated as an adjunct of the house).

Looking to the second Dunn factor, the court notes that while the entire property was circumscribed by a fence, even the defendant agreed that the perimeter fence was not designed for privacy, and that there were "no steps taken that prevented anyone from looking into the property . . . ."[12] Significantly, Smith's bungalow behind the primary farmhouse was surrounded by a 6-foot high solid wood fence, which, according to aerial photographs admitted into evidence at the hearing, clearly delineates an area "intimately tied to the home." Dunn, 480 U.S. at 301 (excluding barn from curtilage where house was

---

[12] Suppression Tr., doc. no. 43, at 64.

25

surrounded by fence, but barn was not); cf. Brown, 510 F.3d at 65 (noting the unhelpfulness of the second Dunn factor because there was no evidence "as to whether there was an enclosure surrounding all or part of Brown's property, or internal enclosures around individual buildings or groups of buildings."). Here, the contrast between the solid barrier surrounding the house and the open nature of the easily surmountable perimeter fence strongly suggests that the latter does not demarcate curtilage.

The final two Dunn factors also warrant exclusion of the driveway from the curtilage. There has been no suggestion that the driveway was being used for "intimate activities of the home." Dunn, 480 U.S. at 302. Finally, the nature and construction of the see-through fence suggested that it was not designed "to prevent persons from observing what lay inside the enclosed areas." Id. The defendant's own testimony confirmed the latter point, as he agreed that "there were really no steps taken that prevented anyone from looking into this property except the [solid wood] privacy fence . . . . [around the rear bungalow]."[13]

It is also noteworthy that while the curtilage analysis is linked to those areas "where privacy expectations are most

---

[13] Suppression Tr., doc. no 43, at 64.

heightened," Ciraolo, 476 U.S. at 212-13, Smith himself testified that the see-through fence around the farm reflected the fact that "it would be kind of ridiculous to expect that you could have privacy on a farm this humongous." Suppression Tr., doc. no. 43, at 66. Given this one-sided record, the court has little difficulty finding that the driveway, including the gate at its entrance, was not part of the curtilage appurtenant to Smith's home, and thus the officers' entry onto the property did not implicate the Fourth Amendment.

2.   Implied license to enter the property

Even if the court were to find that the end of the driveway was part of the home's curtilage, it would nevertheless find no constitutional violation because Lopez and Kibodeaux had an implied license to enter the property that was not, as Smith argues, revoked by the presence of the delivery gate.

In Jardines, the Court recognized that a police officer, like any member of the public, has an implied license to enter a home's curtilage to knock on the front door, seeking to speak with the home's occupants. It was precisely such a "knock-and-talk" that the agents were engaged in here. Smith argues that the closed gate and telephone instructions revoked their license to enter the curtilage. The court disagrees.

The *Jardines* Court explained that the implied license "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Id. at 1416. On this basis, "'a officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do.'" Id. (citing Kentucky v. King, 131 S. Ct. 1849, 1862 (2011)).[14] The home's occupant remains free to terminate the conversation or even to avoid it altogether by not opening the door. See King, 131 S. Ct. at 1862 ("[W]hether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak.").

The necessarily fact-intensive inquiry focuses on what an ordinary member of the public, under the circumstances confronted by the investigators, would have objectively perceived as reasonable conduct. United States v. Carloss, 818

---

[14] In *Jardines*, the Court held that officers' use of trained police dogs to sniff the front porch of a house constituted a search for the purposes of the Fourth Amendment. 133 S. Ct. at 1417–18. The Court reasoned that the porch fell within the curtilage of the home, and the officers' entry into the curtilage to allow the dog's investigation exceeded the implied license to approach the front door for the limited purpose of knocking. Id. at 1415–17. Thus, the Court concluded that the officers' actions constituted an unlicensed physical intrusion on a constitutionally protected area (the curtilage of the home) under the Fourth Amendment. Id.

F.3d 988, 994-95 (10th Cir. 2016). In other words, the question is whether the gate communicated "that first responders, or Girl Scouts, or even officious neighbors[,] were categorically barred" from walking up the driveway and knocking on the door. Id. at 1000 (Tymkovich, J., concurring). Here, the court finds that the answer is "no." At its most basic, the very construction of the fence -- see-through and easily walked-through -- suggests that such visitors were not "categorically barred." Further, the presence of a phone number "for deliveries," would suggest to a reasonable observer that the gate's purpose was to control deliveries, rather than bar the public from knocking on the door. In addition, although not dispositive, neither the gate, the adjacent fence nor any part of the property the public might encounter contained "no trespassing" signs or other privacy warnings. See United States v. Hensel, 699 F.2d 18, 32 (1st Cir. 1983) (finding that officers' entry onto property did not violate 4th Amendment despite chain crossing driveway and presence of multiple "no trespassing" signs).

While the First Circuit Court of Appeals has yet to delineate the contours of revocation, one federal district court has stated that the implied license to enter property "extends unless and until the homeowner provides express orders to the contrary." United States v. Holmes, 143 F. Supp. 3d 1252, 1259

(M.D. Fla. 2015) (internal quotation marks omitted).  The

"express orders" sufficient to revoke the implied license "must

be by 'clear demonstrations,' 'unambiguous,' and 'obvious to the

casual visitor.'"  Id. 143 F. Supp.3d at 1262 (citing State v.

Grice, 767 S.E.2d 312, 319 (N.C. 2015).  Here, there were no

such "express orders," such as a "no trespassing" sign,[15] guard

dogs, or a large, double-padlocked, chain link fence, see United

States v. Hambelton, 2009 WL 722284, at *1-2, 4 (N.D. Fla. Mar.

18, 2009).  Indeed, plaintiff has not cited, nor can the court

locate, any cases where a see-through, easily bypassed gate

unaccompanied "no trespassing" signs or other warnings was found

to have revoked an officer's implied license to walk up to a

front door and commence a knock-and-talk interview.  Here, the

presence of directions for delivery persons to call in order to

drive through the gate does not convey a message to the casual

visitor that the homeowner has revoked the implied license to

enter the curtilage.  This is especially true where, as Agent

Lopez and Inspector Kibodeaux testified, they -- or anyone else

---

[15] While Smith testified that he had intended to, but had not yet, put up "no trespassing" signs, it is not clear that even a "no trespassing" sign, alone, would have been sufficient to revoke the agents' implied license to enter.  As the Supreme Court of Tennessee recently observed, the legal implications of "no trespassing" signs on the validity of a knock-and-talk has resulted in a wide variety decisions by both federal and state courts.  See State v. Christensen, 517 S.W.3d 60, 72 (Tenn. 2017) (and cases cited therein).

-- could have simply spread the two opposing gate sections apart enough to walk through the gap.[16]  Accordingly, even if the agents entered onto the property's curtilage, they did not do so unlawfully.

3.  Consent

Smith next argues that various actions of the agents – including dishonesty and force – undermined the voluntariness of his consent to enter the bungalow and later to search it, and thus tainted the statements he made to the agents in his home, the seizure of his electronic equipment and his written consent to search the equipment.  The court finds that Smith's version of events is not credible, and thus his argument is without evidentiary support.

Consent is a well-recognized exception to Fourth Amendment's search warrant requirement.  See Schneckloth, 412 U.S. at 219; United States v. Laine, 270 F.3d 71, 74-75 (1st Cir. 2001).  The validity of a defendant's consent must be gauged under the totality of the circumstances.  United States

---

[16] Smith testified that the motors controlling that gate had no "give" and that it was not possible to spread the gate sections as Kibodeaux testified, and as he claimed was shown on the photograph admitted into evidence.  Suppression Tr., doc. no. 44, at 190-92.  In the court's view, the photographic evidence which so directly contradicted Smith's testimony on this issue also undermined Smith's overall credibility, and serves as further support for the court's choice to generally credit the investigators' testimony over Smith's.

v. Stierhoff, 549 F.3d 19, 23 (1st Cir. 2008). When evaluating the totality of the circumstances, an inquiring court "must look for evidence of coercion, duress, confusion, and the like." United States v. Coombs, 857 F.3d 439, 449 (1st Cir. 2017). The government must prove by a preponderance of the evidence that Smith's consent was voluntary. Diaz, 494 F.3d at 225.

First, as already noted, the court rejects defendant's assertion that the agents told him that they were "looking for Mexicans" or "illegal aliens," and that they were therefore conducting a "workplace raid," inside the bungalow with which he had no choice but to comply.[17] The court credits the agents' testimony that they informed him that part of their job was to identify potential opportunities for immigrant workers, and that there were other issues they wished to discuss. The agents' version, which candidly acknowledged their permissible investigative ruse, follows logically from their knowledge that child pornography was a sensitive subject and they were giving Smith the courtesy of discussing it outside the presence of his female companion or any other observers. While "deception and trickery" are among the factors to be considered in the "totality of the circumstances" test, "so long as manipulative behavior does not cause us to question whether the

---

[17] Defendant's Mot. to Suppress, doc. no. 19, at 19.

32

relinquishment was in fact voluntary . . ., it is 'reasonable' within the meaning of the Fourth Amendment." United States v. Hornbecker, 316 F.3d 40, 49 (1st Cir. 2003) (citing Schneckloth, 412 U.S. at 222-27). Indeed, "insincere friendliness which successfully induces a criminal suspect to willingly answer questions and/or consent to a search does not, without more, cause us to question whether the suspect's response is 'voluntary.'" Id. The court finds that the "immigrant worker ruse" falls comfortably within these legal boundaries.

Smith next argues that once inside his small home, the agents blocked the exit and told him that they already had a search warrant and would take his property with or without his cooperation. Turning to the latter issue first, it is true that an officer's claim of lawful authority to search, i.e., that he or she already possesses a search warrant, would likely invalidate any subsequent consent. Bumper v. North Carolina, 391 U.S. 543 (1968). However, the court credits the agents' testimony that they told Smith they intended to apply for a search warrant based on Smith's admission that his computer contained images of child pornography.[18] This is permissible. See United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003) (noting that stated intent to get warrant is not inherently

---

[18] Suppression Tr., doc. no. 42 at 44.

coercive where probable cause had been established and officers had good faith belief that warrant would issue); see also, United States v. White, 979 F.2d 539, 542 (7th Cir. 1992) ("[W]hen the officer's expressed intention to obtain a warrant is genuine . . . and not merely a pretext to induce submission, it does not vitiate consent to search."). Nor was the agents' threat to seize the laptop pending such a warrant impermissible, given the ease with which such evidence could be erased, and Smith's comment that he had already used a "cleaner" to erase computer files.[19] See United States v. Bradley, 488 F. App'x. 99 (6th Cir. 2012) (finding that exigent circumstances justified warrantless seizure of suspect's laptop computer as part of child pornography investigation where officer reasonably concluded that evidence on suspect's computer would be destroyed if computer was not immediately seized); see also, United States v. Henry, 827 F.3d 16, 28 (1st Cir. 2016) (holding that officer was justified in warrantless seizure of cell phone to prevent destruction of evidence, when immediately followed by application for search warrant).

The court also rejects Smith's claim that investigators tricked him into signing the consent-to-search[20] form by falsely

---

[19] Id. at 44.

[20] Gov't Ex. 6(a).

representing that it was a property receipt. The agents testified that Smith agreed to sign the form after receiving an explanation of its content and ramifications, and after they informed him that he could decline to sign it or revoke his consent at any time.[21] The court credits this testimony over the defendant's claim of outright trickery -- followed by a perjurious coverup -- by the investigating agents.

As for blocking his exit, the court rejects Smith's testimony that the agents blocked his attempts to leave during the questioning inside his home and that they ignored his attempts to stop the questioning. The court credits the agents' testimony that Smith neither tried to exit nor even approached the doorway, and that he never sought to stop their questioning.[22] Smith's alleged scenario is belied by the relaxed and conversational tone of the recorded portion of the interview, during which Smith's tone of voice evinced no inclination that he wished to discontinue the discussion or that he was in any way stressed.

Ultimately, the court finds that Smith voluntarily consented to the investigators' entry into his home. He further

---

[21] Suppression Tr., doc. no. 42 at 63; Suppression Tr., doc. no. 44, at 15.

[22] Id. at 80; Suppression Tr., doc. no. 44 at 61; Suppression Tr., doc. no. 44, at 125.

consented -- first orally, then in writing -- to the seizure and search of his computer and associated equipment.  None of the agents' words or actions that took place prior to their entrance into his home or once inside vitiated that consent.

**C.    Fifth Amendment**

1.   Questioning at home

Law enforcement personnel must convey Miranda warnings to suspects before subjecting them to "custodial interrogation" in order to protect their Fifth Amendment privilege against self-incrimination.  United States v. Jackson, 544 F.3d 351, 356 (1st Cir. 2008); see also U.S. Const. amend. V. ("No person ... shall be compelled in any criminal case to be a witness against himself.").  "Any statements obtained as a result of custodial interrogation in the absence of Miranda warnings must be suppressed."  Jackson, 544 F.3d at 356.  The prosecution bears the burden of proving by a preponderance of the evidence that the suspect was given Miranda warnings and validly waived his rights.  Miranda, 384 U.S. 436, 475 (1966); United States v. Rojas-Tapia, 446 F.3d 1, 4 (1st Cir. 2006).

In his final argument related to the questioning inside his home, Smith argues that his admissions to possessing child pornography as well as his oral and written consents to seize

and search his electronic equipment were not only obtained through trickery and force -- an argument the court has rejected -- but in the absence of Miranda warnings, allegedly in violation of the Fifth Amendment rights.  The court finds that Smith was not in custody during the questioning at his home, and thus that no Miranda warnings were necessary.

A court considering whether a defendant was subjected to custodial interrogation must determine whether there was a formal arrest or a restraint on freedom of movement to the degree associated with a formal arrest.  Id.  In the absence of a formal arrest (as here):

> determining whether a person is in custody ordinarily requires a nisi prius court to engage in a two-step pavane.  First, the court must ascertain the circumstances surrounding the interrogation.  Thompson v. Keohane, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995).  This assessment is factual in nature and, as such, is reviewed for clear error.  See United States v. Ventura, 85 F.3d 708, 711 n.2 (1st Cir. 1996).  Second, the court must examine whether, viewed objectively, the discerned circumstances constitute the requisite 'restraint on freedom of movement of the degree associated with a formal arrest.'  California v. Beheler, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983) (per curiam) (internal quotation omitted).

United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011).  The First Circuit Court of Appeals has identified four factors informing this analysis:  "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of

physical restraint placed upon the suspect, and the duration and character of the interrogation." Ventura, 85 F.3d at 711 (1st Cir. 1996) (citing United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987)).

Here, the investigators questioned Smith in familiar surroundings -- his home. And while the presence of three officers in a kitchen might weigh slightly in favor of finding a custodial situation under some circumstances, the fact that Investigator Kibodeaux told Smith that he was free to leave counterbalances that weight.[23] In addition, the interview was relatively short in duration, lasting under an hour.[24] Moreover, the court detected no hostility, threats or "menacing"[25] behavior by the agents in the taped portion of the kitchen conversation. To the contrary, the entire conversation sounded relaxed, with Smith both asking and answering questions. Smith's version that the portion of the interview prior to the recording would have evinced the hostility and coercion of which he speaks, yet he made no mention of it during the recorded portion strains credulity and is rejected. Similarly, and as already noted, the

---

[23] Suppression Tr., doc. no. 43, at 35 ("And Officer Kibodeaux said, well, first of all, you're not being detained, you're free to go, and you can stop answering questions at any time.").

[24] Suppression Tr., doc no. 44, at 75.

[25] Def. Supp. Mem., doc no. 19, at 23.

relaxed conversational tenor lends further support to the court's rejection of Smith's contention that the investigators physically blocked his attempts to leave.  Absent indicia of custodial interrogation, the court finds that Smith was not entitled to Miranda warnings prior to the questioning in his home.

2.   Smith's video-recorded confession

Unlike the questioning at his home, there is no dispute that Smith's recorded confession took place while he was in custody.  Nor is there any argument that Investigator Kibodeaux read the familiar warnings to Smith at the outset of her questioning and that Smith waived his rights.  Nevertheless, Smith argues that he was tricked into coming to the police station and misled into believing he would be released once he answered more questions thus rendering Miranda waiver involuntary -- and thus the confession inadmissible.  The court rejects this argument.

A confession is involuntary if the police use coercive means to undermine the suspect's ability to exercise his free will.  See Colorado v. Connelly, 479 U.S. 157, 167 (1986). In assessing whether a confession is voluntary, courts must inquire "whether the will of the defendant had been overborne so that

the statement was not his free and voluntary act." Bryant v. Vose, 785 F.2d 364, 367-68 (1st Cir. 1986).

As for being "tricked into coming to the police station," it is true that Agent Lopez told Smith that he could pick up his equipment at the station.[26] However, as Investigator Kibodeaux explained, once she and the other agents decided that they would arrest Smith because they discovered pornographic images on his computer involving the child whose picture was on his refrigerator,[27] they further determined that officer safety considerations warranted drawing him to them, rather than the officers taking another trip to the farm, which would present more risk.[28] Nothing about this very routine undertaking by police -- arranging for a more secure, in-station arrest of a suspect in a controlled environment -- suggests that Smith's will was overborne.

Next, the court credits Investigator Kibodeaux's testimony that she did not promise him freedom in exchange for interrogation. Instead, she told him he was being detained as soon as he entered the station.[29]

---

[26] Suppression Tr., doc. no. 42, at 69-70.

[27] Id.

[28] Id.

[29] Id. at 72.

Finally, any claim that Smith waived his Miranda rights involuntarily is completely undermined by the video recording of his waiver. After agreeing that he had already been told he was not free to leave, Smith and Kibodeaux engaged in a lengthy colloquy in which Smith asked intelligent, relevant questions addressing nearly every aspect of the familiar warnings, including multiple questions concerning his right to stop the questioning at any time. He indicated his assent and understanding as to every aspect of the Fifth Amendment safeguard. His Miranda waiver was voluntary and valid.

## III. CONCLUSION

Having found that the search warrant targeting Smith's email account was properly authorized, that his consent to search his home and computer was given freely and voluntarily, and that his pre-detention statements and recorded confession was not obtained in violation of his Fifth Amendment rights, defendant's motion to suppress[30] is DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: October 18, 2017

---

[30] Doc. no. 18.

41

cc:  Jeffrey S. Levin, Esq.
     Bjorn R. Lange, Esq.
     Richard Guerriero, Esq.
     Seth R. Aframe, AUSA
     Georgiana L. Konesky, AUSA